The CITY OF SAN ANTONIO,
Appellant,

v.

EL DORADO AMUSEMENT
COMPANY, INC.,
Appellee.

No. 04–04–00638–CV.

Court of Appeals of Texas,
San Antonio.

Feb. 15, 2006.

Rehearing Overruled April 27, 2006.

Deborah L. Klein, Asst. City Atty., Jacqueline M. Stroh, Crofts & Callaway, P.C., San Antonio, for appellant.

Andrew E. Toscano, Gene Toscano, Gene Toscano, Inc., San Antonio, Geoffrey N. Courtney, Austin, for appellee.

Sitting: SARAH B. DUNCAN, Justice, KAREN ANGELINI, Justice, SANDEE BRYAN MARION, Justice.

## OPINION

Opinion by SANDEE BRYAN MARION, Justice.

This is an appeal from the trial court's judgment in favor of appellee on appellee's regulatory takings claims against appellant.

## BACKGROUND

Appellee, El Dorado Amusement Company, was the owner of the land and a building located at 8235 Vicker Drive, which location has been operated, over the years, as a bar, pool hall, and club, always selling alcoholic beverages. The land owned by El Dorado comprises one city block. Vicker Drive comprises about two city blocks. In January 1999, the San Antonio City Council member for the property's district requested a rezoning of the El Dorado property from B–3 Local Retail to B–3NA. B–3NA district regulations are the same as in a B–3 district; except that the sale of alcoholic beverages for on-premises or off-premises consumption is not permitted. The Zoning Commission recommended approval of the rezoning, and the San Antonio City Council approved the rezoning request.

In March 1999, El Dorado applied for a non-conforming use to operate a bar with on-premises alcohol consumption. The City of San Antonio denied the request. El Dorado appealed to the Board of Adjustment, and the original denial was upheld.

El Dorado then sued the City, asserting a takings claim or, alternatively, that it had the right to obtain a non-conforming use permit from the City. At a March 2, 2004 hearing, the parties submitted the liability issues to the trial court by written brief. Also at this hearing, the parties signed and presented to the court stipulated facts. In its trial brief, El Dorado asserted a takings had occurred; the rezoning ordinance was invalid because the City Council did not follow Robert's Rules of Order when it considered the ordinance; the ordinance was not designed to follow the City's comprehensive zoning plan and was, instead, intended to discriminate against the property owner; and, if the ordinance was valid, the property owner was entitled to non-conforming use rights, the denial of which was unlawful. On April 1, 2004, the trial court announced its decision that a taking had occurred and, thus, a hearing was held on damages and attorney's fees. Following the hearing, the trial court entered judgment for El Dorado, awarding damages and attorney's fees. This appeal by the City ensued.

## ADDITIONAL FINDINGS OF FACT

■ In its first issue, the City contends the trial court's failure to make additional findings and conclusions is fatal to El Dorado's ability to recover.

■ The court shall file any additional findings and conclusions *that are appropriate* within ten days after a request is filed. TEX.R. CIV. P. 298 (emphasis added). If the record shows the complaining party did not suffer injury, the trial court's failure to make such additional findings does not require reversal. *Johnston v. McKinney Am., Inc.*, 9 S.W.3d 271, 277 (Tex. App.-Houston [14th Dist.] 1999, pet. denied); *Tamez v. Tamez*, 822 S.W.2d 688, 692 (Tex.App.-Corpus Christi 1991, writ denied). To obtain a reversal, the appel-

lant must show from the record that the trial court's refusal to file additional findings of fact and conclusions of law as requested was reasonably calculated to cause and did cause rendition of an improper judgment. *Doncaster v. Hernaiz,* 161 S.W.3d 594, 608 (Tex.App.-San Antonio 2005, no pet.); *Tamez,* 822 S.W.2d at 693. If the trial court's refusal to make additional findings does not prevent an adequate presentation on appeal, there is no reversible error. *Id.* The issue is whether the circumstances are such that the appellant is forced to guess at the reasons for the trial court's decision. *Doncaster,* 161 S.W.3d at 608. We conclude the court's original findings and conclusions that El Dorado's property was confiscated and that the ordinance was invalid and void do not omit or contain an error on a material element and sufficiently reflect the evidence. Therefore, the City has not been forced to guess at the reasons for the trial court's decision, nor has the trial court's refusal to make additional findings prevented an adequate presentation on appeal.

## DID THE REZONING CONSTITUTE A "TAKING"?

In its second issue, the City argues the evidence is insufficient to support the trial court's findings, and the trial court's conclusions lack any legal basis. The City asserts no taking occurred because there was no physical invasion of the property; the property did not lose all economic viability; and, if the ordinance is invalid, then ordinance invalidity is not a basis to recover on a inverse condemnation claim. The City also asserts there is insufficient evidence that it acted with intent, that any taking was for public use, and that the rezoning caused El Dorado's losses.

### A. Intent and Public Use

 The City asserts El Dorado was required to establish that the City acted with intent and that any taking was for public use. The City asserts there is insufficient evidence of intent, relying on *City of Dallas v. Jennings,* 142 S.W.3d 310, 314 (Tex.2004), for its argument that it did not know a specific act would cause identifiable harm or know that specific property damage was substantially certain to result from an authorized government action. The City also contends there was no taking for public use, relying on *DuPuy v. City of Waco,* 396 S.W.2d 103 (Tex. 1965), for its argument that its action was more akin to an exercise of police power because it was acting to regulate a use of the property that was detrimental to the public. However, the City's arguments confuse three types of "takings." " 'Taking,' 'damaging,' and 'destruction' of one's property are three distinct claims arising under Article I, Section 17 [of the Texas Constitution]." *City of Dallas,* 142 S.W.3d at 313 n. 2. "[T]he term 'taking' [is] used as a shorthand to refer to all three types of claims." *Id.* In the cases relied upon by the City, the courts were specifically addressing physical appropriation or physical damage to property. Here, the type of taking at issue is a regulatory taking.

The jurisprudence involving condemnations and physical takings utilizes a straightforward application of *per se* rules. *Tahoe–Sierra Preservation Council v. Tahoe Regional Planning Agency,* 535 U.S. 302, 322, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002). However, the regulatory takings jurisprudence is characterized by an ad hoc factual inquiry, which involves an evaluation of all relevant circumstances. *Id.* (characterizing regulatory takings jurisprudence as being "of more recent vintage"). The longstanding distinction between acquisitions of property for public use and regulations prohibiting private uses makes it inappropriate to treat cases

involving physical takings as controlling precedents for the evaluation of a claim that there has been a regulatory taking. *Id.* at 323, 122 S.Ct. 1465. In *Tahoe–Sierra,* the United States Supreme Court reiterated its holding in *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), that "if regulation goes too far it will be recognized as a taking." *Id.* at 326, 122 S.Ct. 1465. "After *Mahon,* neither a physical appropriation nor a public use has ever been a necessary component of a 'regulatory taking.'" *Id.* Therefore, El Dorado was not required to establish that the taking was for the public use.

For a similar reason we reject the City's argument that intent must be shown in a regulatory takings claim. "In a regulatory taking, it is passage of the ordinance that injures a property's value or usefulness." *Lowenberg v. City of Dallas,* 168 S.W.3d 800, 802 (Tex.2005) (noting the "sharp distinctions" between physical takings and regulatory takings). Therefore, we hold El Dorado was not required to "allege that the State knew the act would cause an identifiable harm or that specific property damage [was] substantially certain to result." *See State v. Holland,* 161 S.W.3d 227, 232 (Tex.App.-Corpus Christi 2005, pet. filed) (holding that the "two prongs set out by the supreme court [in *Lowenberg* ] to establish the intent element in a 'damage' claim are not necessary in a 'taking' claim").

## B. Takings and Causation

▮▮▮▮ "Zoning decisions are vested in the discretion of municipal authorities; courts should not assume the role of a super zoning board." *Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 933 (Tex. 1998). "However, despite the discretion afforded to municipal authorities, zoning decisions must comply with constitutional limitations." *Id.* "[T]the ultimate question of whether a zoning ordinance constitutes a compensable taking or violates due process or equal protection is a question of law, not a question of fact." *Sheffield Dev. Co. v. City of Glenn Heights,* 140 S.W.3d 660, 673 (Tex.2004). "In resolving this legal issue, we consider all of the surrounding circumstances." *Id.*

▮▮▮▮ There are various circumstances under which a regulatory action may constitute a taking. First, a taking results when the regulation causes a physical invasion of the property. *Id.* at 671. Second, a taking results when the regulation denies the owner all economically beneficial or productive use of the land or unreasonably interferes with the landowner's rights to use and enjoy its property. *Id.; Mayhew,* 964 S.W.2d at 935.

▮▮▮▮ Because El Dorado's property was not physically taken, we must determine whether the City imposed restrictions that either (1) denied El Dorado all economically viable use of its property, or (2) unreasonably interfered with El Dorado's right to use and enjoy its property. Determining whether all economically viable use of a property has been denied entails a relatively simple analysis of whether value remains in the property after the governmental action. *Mayhew,* 964 S.W.2d at 935. A restriction denies a landowner all economically viable use of the property or totally destroys the value of the property if the restriction renders the property valueless. *Id.* This type of taking is limited to "'the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted' and 'the landowner is left with a token interest.'" *Sheffield,* 140 S.W.3d at 671 (emphasis in original). Our review of the record reveals that the rezoning denied El Dorado *an* economically viable use of its property; however, that is not the test.

The mere fact that an ordinance has prevented the most profitable use of property does not conclusively establish that there has been a taking. *See Taub v. City of Deer Park*, 882 S.W.2d 824, 826 (Tex.1994). "[I]mportant considerations are whether property has been rendered 'wholly useless,' or whether its value has been totally destroyed." *Id.* There is no evidence El Dorado's property was rendered "wholly useless," or that "its value has been totally destroyed."

▬▬▬ Next, we determine whether the government unreasonably interfered with the landowner's right to use and enjoy the property. This determination requires a consideration of two factors: the economic impact of the regulation and the extent to which the regulation interferes with distinct investment-backed expectations. *Mayhew*, 964 S.W.2d at 935. The first factor merely compares the value that has been taken from the property with the value that remains in the property. *Id.* at 935–36. Lost profits is a relevant factor to consider in assessing the value of property and the severity of the economic impact of rezoning on a landowner. *Sheffield*, 140 S.W.3d at 677. The second factor is the investment-backed expectation of the landowner. *Mayhew*, 964 S.W.2d at 936. "The existing and permitted uses of the property constitute the 'primary expectation' of the landowner that is affected by regulation." *Id.* "Knowledge of existing zoning is to be considered in determining whether the regulation interferes with investment-backed expectations." *Id.*

▬▬▬ The City asserts it did not unreasonably interfere with El Dorado's right to use and enjoy the property because the operation of an establishment that sells alcohol for on-premise consumption requires a governmental permit. In *Hallco Texas, Inc. v. McMullen County, Texas*, 94 S.W.3d 735, 738 (Tex.App.-San Antonio 2002, pet. granted), this court considered whether the county's rejection of a landowner's variance request deprived the owner of its reasonable investment-backed expectations. Because the landowner never had a permit to use the property in the manner for which it sought the variance, a panel of this court determined that the county's action did not result in a taking. *Id.* (relying on Texas Administrative Code section 305.122, which specifically provides that a permit to dispose of waste does not create or constitute a "property interest" or any other entitlement). Here, there is no dispute that El Dorado had a license to sell alcohol for on-premises consumption. In fact, prior to the rezoning, the property had always been operated as a business that served alcohol. "Historical uses of the property are critically important when determining the reasonable investment-backed expectations of the landowner." *Mayhew*, 964 S.W.2d at 937; *see also Hallco*, 94 S.W.3d at 738. Because existing and permitted use of the property constitutes a "primary expectation," we hold that the requirement of a permit does not *per se* defeat a takings claim.

At trial, Alex Habib, sole shareholder and president of El Dorado, and Gene Trevino, a forensic economist, testified about the value of the property when it was zoned for the sale of alcohol and its value after the rezoning. Habib testified El Dorado's business involved "lounges and vending machines." The parties stipulated that, "[f]or eighteen years, the property was operated regularly and continuously in this fashion, and at the time of the change in zoning was leased to the operators of a nightclub known as 'Chocolate City' for ten years." Habib stated he had invested over $800,000 in the building and property. For about ten to fifteen years, El Dorado leased the property to the same tenant for $10,000 per month. After this

tenant left, another tenant was found, who paid $8,000 per month for about six months. The club closed after a disturbance on the premises in November 1998. Despite on-going efforts to reopen the club, the City rezoned the property in January 1999, so that the sale of alcoholic beverages was no longer permitted. As a result, from early 1999 and for the next several years, Habib attempted to sell or lease the property. The property had no tenants during 1999. In 2000, El Dorado was able to rent the location to "teen clubs" that could operate without a liquor license. This brought in rent of $5000 per month for about four months. In 2001, El Dorado leased the property for two months at $3000 per month. Trevino testified the property earned more income and higher profits when it operated with a license to sell alcohol. In January 2003, El Dorado sold the property for $418,000.

We conclude this evidence supports a finding that the enactment of the rezoning ordinance had a severe economic impact on El Dorado's business and unreasonably interfered with El Dorado's investment-backed expectations. Therefore, we hold a compensable regulatory taking resulted from the City's rezoning of El Dorado's property and the taking caused El Dorado's damages. *See First English Evangelical Lutheran Church of Glendale v. County of Los Angeles,* 482 U.S. 304, 315, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987) ("Thus, government action that works a taking of property rights necessarily implicates the 'constitutional obligation to pay just compensation.' ").

## C. Damages

■ The trial court's award of $662,301 in actual damages contains two components: (1) $420,301 in past lost profits and (2) $242,000 for the loss of the value of the property when it was sold. The City first complains that El Dorado failed to present evidence of damages using the appropriate measure of recovery. The City contends El Dorado was required to utilize the "comparable sales" method for calculating damages or prove that this method was inadequate. According to the City, there is no evidence of El Dorado's damages using a method sanctioned by Texas law. We disagree. At trial, El Dorado utilized the income method, which is one of the three traditional approaches to determining market value. *See City of Harlingen v. Sharboneau,* 48 S.W.3d 177, 182 (Tex. 2001).

■ The City next complains the trial court erred by entering a judgment that awarded El Dorado a double recovery for both lost profits and the difference in market value after the property was sold. We agree. "The ability of a business to make a profit is reflected in its market value." *City of San Antonio v. Guidry,* 801 S.W.2d 142, 150 (Tex.App.-San Antonio 1990, no writ); *see also State v. Whataburger, Inc.,* 60 S.W.3d 256, 262 (Tex.App.-Houston [14th Dist.] 2001, pet. denied). Any award for lost profits constitutes a double recovery. *Id.*

■ Finally, the City complains that El Dorado's expert, Gene Trevino, failed to properly calculate the damages using the income method. According to the City, Trevino failed to testify about the capitalization rate, failed to utilize the correct "before and after" values, failed to testify regarding the property's profitability based upon its best and highest use, and improperly utilized the profitability factor to value the amount at which the property should have sold. The City concludes these deficiencies rendered Trevino's testimony speculative and, therefore, of no evidence.

The income approach to value proceeds on the premise that a buyer of income-producing property is primarily interested in the income its property will generate. *Polk County v. Tenneco, Inc.*, 554 S.W.2d 918, 921 (Tex.1977). The income method involves estimating the future income of the property and applying a capitalization rate to that income to determine market value. *Id.; City of Dallas v. Redbird Dev. Corp.*, 143 S.W.3d 375, 384 (Tex.App.-Dallas 2004, no pet.). The capitalization rate is the rate of interest investors would require as a return on their money before they would invest in the income-producing property, taking into account all the risks involved in that particular enterprise. *City of Dallas,* 143 S.W.3d at 384.

Trevino testified he reviewed tax returns; leases between El Dorado and numerous tenants, signed before and after the zoning change which resulted in the loss of the ability to sell alcohol; and the sales contract. He estimated the value of the land and building at $660,000. He reached this conclusion by factoring into his analysis past lost profits, future lost profits, and total future revenues. He estimated future lost profits in the amount of $420,301, which he explained as follows:

The estimated lost normalized operating profits were then increased at an average estimated annual growth rate of 3% over 30 years. This growth estimate is consistent with historical and projected inflation and includes a marginal premium for real growth (Ibbotson Associates 1998; Philadelphia Federal Reserve Board, 2001). The 30 year time horizon was chosen because it is consistent with the capitalized value of the future operating profit.

The projected operating profits were then discounted at a discount rate of 15% in order to calculate the present values. The discount rate was formulated by adding a property specific risk premium to the historical average total return for equity real estate investments in real estate investment trusts of 12.15%. Because the subject property is not levered and has a consistent history of being occupied, the 285 basis point risk premium is conservative. Nevertheless, the risk premium considers the fact the property would require renovation in order to be used for other purposes. . . . .

Trevino estimated total future revenues at $975,659. When the property was sold, Trevino re-calculated past lost profits at $420,301. Taking all his estimates into consideration, Trevino estimated the value of the property to be $660,000, from which he subtracted the sales price of $418,000 to arrive at a total of $242,000 for the loss of the value of the property when it was sold. We conclude Trevino's valuation under the income method was reliable, and his testimony regarding the value of the property constituted legally sufficient evidence to support the judgment.

### D. Prejudgment Interest and Costs

The trial court awarded prejudgment interest in the amount of $182,178.94 "based on the date of the taking of December 4, 1998, through June 4, 2003 . . . ." The City asserts the trial court erroneously awarded prejudgment interest using the wrong accrual date. We agree. With certain exceptions that do not apply here, "prejudgment interest accrues on the amount of a judgment during the period beginning on the earlier of the 180th day after the date the defendant receives written notice of a claim or the date the suit is filed and ending on the day preceding the date judgment is rendered." TEX. FIN. CODE ANN. § 304.104 (Vernon Supp.2004–05). El Dorado did not provide the City

with written notice; therefore, the proper accrual date is the date suit was filed, July 23, 1999.

### E. Attorney's Fees and Costs

 The City first contends El Dorado is not entitled to fees because it did not recover any declaratory relief. We agree. Attorney's fees are not recoverable unless authorized by statute or by contract. *See New Amsterdam Casualty Co. v. Texas Indus. Inc.,* 414 S.W.2d 914, 915 (Tex.1967). El Dorado obtained relief based upon the trial court's determination that the rezoning resulted in a compensable taking. Article I, Section 17 of the Texas Constitution, under which El Dorado obtained relief, does not authorize attorney's fees in a takings case. Therefore, the trial court erred in awarding such fees to El Dorado.

 The City also asserts El Dorado cannot recover costs in the amount of $171.00 because it did not comply with Civil Practice and Remedies Code section 31.007, which provides that, "Each party to a suit shall be responsible for accurately recording all costs and fees incurred during the course of a lawsuit, if the judgment is to provide for the adjudication of such costs. If the judgment provides that costs are to be borne by the party by whom such costs were incurred, it shall not be necessary for any of the parties to present a record of court costs to the court in connection with the entry of a judgment." *Id.* § 31.007(a). We review a trial court's assessment of costs for an abuse of discretion. *Crescendo Inv., Inc. v. Brice,* 61 S.W.3d 465, 480 (Tex.App.-San Antonio 2001, pet. denied). Here, the clerk's record contains a Bill of Cost prepared by the clerk of the court. Although this document was not prepared in advance of the trial court's judgment, we note that the costs paid by El Dorado equals the amount awarded by the court in its judgment. Therefore, the record does not support a finding that the court abused its discretion in awarding El Dorado costs in the amount of $171.00.

### VIOLATION OF CIVIL RIGHTS

 In its petition, El Dorado pled for damages resulting from the City's alleged violation "of its civil rights protected by the Bill of Rights in the Texas Constitution." El Dorado claimed it was a victim of abuse of process. Texas has no statutory or implied private right of action for damages for constitutional violations. *See City of Beaumont v. Bouillion,* 896 S.W.2d 143, 147–49 (Tex.1995) (holding that under Texas law there is no implied private right of action for damages for violations of free speech and free assembly rights). Therefore, El Dorado cannot use the Texas Constitution to seek damages for alleged violations of Texas constitutional rights.

### NON–CONFORMING USE RIGHTS

 Following the City Council's enactment of the rezoning ordinance, El Dorado applied to the San Antonio Zoning Board of Adjustment for a non-conforming use permit. On April 12, 1999, the City denied the request. The trial court determined El Dorado was entitled to non-conforming use rights. On appeal, the City asserts El Dorado did not exhaust its administrative remedies.

 "The legislature has expressly provided a means for challenging an action taken by a city's zoning board of adjustment." *West Texas Water Refiners, Inc. v. S & B Beverage Co.,* 915 S.W.2d 623, 626 (Tex.App.-El Paso 1996, no writ); *see* TEX. LOC. GOV'T CODE ANN. § 211.011 (Vernon 1999). A petition for a writ of certiorari asserting a decision by the board of adjustment is illegal must be brought within ten days after the decision is filed in the

250

board's office. TEX. LOC. GOV'T CODE ANN. § 211.011(a), (b). The only issue to be determined in a writ of certiorari proceeding is the legality of the board's order. *West Texas Water Refiners*, 915 S.W.2d at 626. A suit not brought pursuant to the statutory provisions is an impermissible collateral attack. *Id.* El Dorado did not bring a petition for a writ of certiorari. However, El Dorado contends it has the right to collaterally attack the board's refusal to grant it a non-conforming use permit because the board's decision flowed from a void ordinance.

■■■■ A board of adjustment derives its power from both the statute and the city ordinance establishing it and defining its local function and powers. *Id.* "A board of adjustment must act within the strictures set by the legislature and the city council and may not stray outside its specifically granted authority. Any action exceeding this authority is null and void and subject to collateral attack." *Id.* A distinction exists, however, between whether a board of adjustment has the power to act and whether it has exercised that power illegally. *Id.* In the former, a district court may make a determination notwithstanding the statutory procedure. *Id.* at 626–27 (trial court had jurisdiction to determine whether adjustment board had power to grant exception). In the latter, the only means to challenge a board's action is through the statutory writ of certiorari proceeding. *Id.* at 626.

Here, the board of adjustment had the power either to grant or to not grant El Dorado the non-conforming use permit. Whether it properly denied El Dorado's request is a challenge El Dorado was required to make through the statutory writ of certiorari proceeding, which it did not do. The administrative remedies provided by the Local Government Code must be exhausted before matters regarding non-conforming uses may be brought before the courts. *Winn v. City of Irving*, 770 S.W.2d 10, 11 (Tex.App.-Dallas 1989, no writ). Because El Dorado did not exhaust its administrative remedies, the trial court lacked jurisdiction to determine the propriety of the adjustment board's denial of the non-conforming use permit.

## CONCLUSION

We reverse that portion of the trial court's judgment awarding El Dorado $420,301 in lost profits, awarding El Dorado the sum of $182,178.94 in pre-judgment interest, and awarding El Dorado attorney's fees. We render judgment that El Dorado take nothing on its claim for lost profits and its claim for attorney's fees. We remand this case to the trial court to calculate prejudgment interest consistent with this opinion. In all other respects, we affirm the trial court's judgment.