Kyung PARK, Sunghee Park, and Piola Services, L.L.C., Appellants,

v.

The CITY OF SAN ANTONIO, Appellee.

No. 08–06–00102–CV.

Court of Appeals of Texas, El Paso.

July 19, 2007.

---

Kenneth E. Grubbs, Law Office of Kenneth Grubbs, San Antonio, TX, for Appellants.

David M. Williams, Office of the City Attorney, San Antonio, TX, for Appellee.

Before CHEW, C.J., McCLURE, and CARR, JJ.

### OPINION

KENNETH R. CARR, Justice.

Appellants Kyung Park; his wife, Sunghee Park; and Piola Services, L.L.C. (Appellants will be referred to collectively as "Park") filed the underlying lawsuit against the City of San Antonio ("the City"), alleging negligence, gross negligence, and inverse condemnation. The trial court granted partial summary judgment in favor of the City on Park's negligence and gross negligence claims. Following a bench trial, the court also granted judgment in the City's favor on Park's inverse condemnation claim. Park now appeals the judgments on each of the causes of action. For the reasons that follow, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Dr. Park and his wife formed Piola Services, L.L.C. between 1994 and 1995 to develop seventeen acres of real property, located at 7667 Potranco Road in San Antonio, as a golf driving range, club house, and batting cages.[1] When Park first became interested in the property, it was zoned for single- and multi-family residential use. In August 1995, at Park's request, the City re-zoned the property to include a provision for specific business use as a golf driving range.[2] The property abuts a residential neighborhood.

Park began to develop the property following the zoning approval. In March 1996, the City approved the facility site plan, and building began. The City issued building permits throughout the development process, including permits for the clubhouse, batting cages, and driving range. The site plan which the City approved included plans to build high fences made out of netting along the sides of the property as part of the driving range. The finished barriers were twenty to twenty-five feet high along the back of the property, and fifty feet high along the sides. There is no record of a building permit issued specifically for the fences, but the City issued a Certificate of Occupancy for the business, including the fences, in September 1996.

Park testified that, from the facility's first days, the driving range was the major source of income. Not long after the driving range opened, however, Park began getting complaints from the residents of the neighborhood that golf balls were landing in their backyards. In response to the complaints, Park raised the net fence along the property line which the driving range shared with the residential lots to forty feet. Park did not notify the City when he raised the netting.

In May 1997, a severe storm caused the poles supporting the net barrier to break, and the netting fell onto the driving range. Park applied for a permit to replace the broken wooden poles with steel, so that

---

1. Kyung Park, M.D., had been a resident of San Antonio since the early 1980's. From 1982 until 2002, Dr. Park had a private neurological practice, also in San Antonio.

2. The San Antonio City Council approved the re-zoning as follows: "The rezoning and reclassification of property from Temporary 'R–1' Single Family Residence District and 'R–3' Multiple Family Residence District to 'R–1' CC Single Family Residence District for a golf driving range, and 'B–3' Business District and from 'R–3' Multiple Family Residence District to 'R–3' CC Multiple Family Residence District for a golf driving range...." The City Council approved the zoning request, despite a staff recommendation against the change.

another storm would not knock the net down again. The City's Director of Building Inspections denied the repair permit and recommended that Park apply to the Board of Adjustment for a variance and permit to make the repairs to the, now, forty-foot high fence.

Prior to the time when Park requested the re-zoning, the City's zoning and building regulations had been compiled into the "Uniform Development Code" ("UDC"). Under the UDC, fences were not permitted to exceed six feet in height, without a variance. Gene Camargo, the City's Director of Building Inspections until January 2001, testified that he believed that the height of the fence was simply overlooked when the original building site plan was approved and again when the Certificate of Occupancy was issued. Camargo also testified that, because Park never applied for a permit specifically for the fence, the City was not aware of the fence height violation until Park applied for a permit to make repairs.

After Park's request for a zoning variance to allow the extra fence height was denied by the Board of Adjustment, he appealed the decision to the district court. The district court remanded the case to the Board of Adjustment for reconsideration. After the Board of Adjustment again refused to grant the variance, Park gave up on pursuing the driving range business. Park was forced to tear down the driving range fence and close that part of the facility. Without the income from the driving range, the business faltered, and it was eventually foreclosed and sold. Park testified that he did not investigate the market value of the property following the variance denial and never attempted to market the property for alternative development.

Park filed this lawsuit on October 17, 2000, alleging that the City was negligent and grossly negligent by re-zoning the property, because it failed to warn Park about the UDC restrictions on fence height. Park also asserted a claim for inverse condemnation under article I, section 17 of the Texas Constitution, alleging that the City's regulations constituted a "taking" of the property for public use.

The City filed a hybrid motion for summary judgment on Park's negligence and gross negligence claims, arguing, in part, that there was not an applicable waiver of sovereign immunity. The trial court granted the City's motion for summary judgment as to negligence and gross negligence. The liability elements of the inverse condemnation claim were tried to the court without a jury. Following the bench trial, the trial court entered judgment in favor of the City on the inverse condemnation claim. Park appeals both judgments.

In Issue One, Park contends the trial court improperly granted summary judgment as to his negligence and gross negligence claims. In Issue Two, Park challenges the trial court's judgment in the City's favor on his claim for inverse condemnation.

## DISCUSSION

■ In Issue One, Park contends that the trial court erred in granting summary judgment in favor of the City on his negligence and gross negligence causes of action. The standards for reviewing summary judgments are well established. *Western Invs., Inc. v. Urena,* 162 S.W.3d 547, 550 (Tex.2005). When, as in this case, the trial court does not specify the basis for its ruling, it is the appellant's burden on appeal to show that each of the independent grounds asserted in support of summary judgment is insufficient to support the trial court's ruling. *See Star–Telegram, Inc. v. Doe,* 915 S.W.2d 471, 473 (Tex.1995); *Lee v. Levi Strauss & Co.,* 897

S.W.2d 501, 504 (Tex.App.-El Paso 1995, no writ). If the appellant fails to challenge one of the grounds asserted for summary judgment, the judgment may be affirmed on that ground alone. *Star–Telegram*, 915 S.W.2d at 473; *Humane Soc'y v. Dallas Morning News, L.P.*, 180 S.W.3d 921, 923 (Tex.App.-Dallas 2005, no pet.).

■ The City's motion for summary judgment on Park's negligence and gross negligence causes of action included eight separate grounds. The first ground challenged Park's ability to establish that he had satisfied the notice requirement under the Texas Tort Claims Act ("TTCA"), which is a prerequisite to suing a governmental unit. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.101. The City also asserted that Park failed to identify a waiver of its protection from suit under the doctrine of sovereign immunity.[3] The remainder of the City's grounds challenged the evidence in support of the merits of Park's negligence and gross negligence causes of action and argued that the City is immune from liability for exemplary damages and attorney's fees.

■ In its order granting the City's motion, the trial court stated:

> The court finds that the [City] is entitled to summary judgment on its requests for summary judgment on [Park's] causes of action for Negligence and Gross Negligence. The court finds that [Park] has not provided sufficient evidence to raise a genuine issue of material facts on these causes of action and

that [the City] is entitled to summary judgment as a matter of law.

Park argues that the trial court did not grant summary judgment based on governmental immunity, and he expressly chose not to address those grounds for summary judgment in his brief to this Court. Park reads the trial court's order too narrowly. While the summary judgment order does specify that the court granted the City's motion only as to the negligence and gross negligence causes of action, it does not specify upon which ground or grounds the court did so.

■ In a suit against a governmental unit, such as the City of San Antonio, a plaintiff bears the burden of complying with the notice requirements of the TTCA, as well as of pleading and proving an express waiver of sovereign immunity. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.101; *see also Dallas Area Rapid Transit v. Whitley*, 104 S.W.3d 540, 542 (Tex.2003) (in a suit against a governmental unit, the plaintiff must affirmatively demonstrate a valid waiver of immunity). Without an express waiver of sovereign immunity, the trial court lacks subject matter jurisdiction over the lawsuit. *Texas Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex.1999). Lack of subject matter jurisdiction due to sovereign immunity can be raised in several ways, including by a motion for summary judgment. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex.2000).

---

**3.** The TTCA modifies the sovereign immunity of governmental entities and provides "[t]he most well recognized and comprehensive statutory exceptions to sovereign immunity" in Texas. *See Bennett v. Tarrant County Water Control & Improvement Dist.*, 894 S.W.2d 441, 450 (Tex.App.-Fort Worth 1995, writ denied). Within the Act, however, the legislature expressly declined to waive immunity for a governmental unit's discretionary acts. *See* TEX.

CIV. PRAC. & REM. CODE ANN. § 101.056. This provision is commonly referred to as the "discretionary function exception." *See Mitchell v. City of Dallas*, 855 S.W.2d 741, 745 (Tex. App.-Dallas 1993), *aff'd*, 870 S.W.2d 21 (Tex. 1994). The discretionary-function exception to the TTCA's waiver of sovereign immunity is designed to avoid judicial review of governmental policy decisions. *Id.* at 745.

Because the trial court did not specify the ground upon which it granted summary judgment, the burden falls on Park to show that each of the grounds asserted by the City was insufficient to support the order. *Lee*, 897 S.W.2d at 504. Since Park has not addressed at least two potential grounds in his argument to this Court, we affirm the trial court's order on that basis, even if there were no other bases.[4] *See Humane Soc'y*, 180 S.W.3d at 923. Accordingly, we overrule Issue One.

■■■■ In Issue Two, Park challenges the trial court's entry of judgment in favor of the City on his claim for inverse condemnation.[5] A landowner may, pursuant to article I, section 17 of the Texas Constitution, bring an inverse condemnation claim when his property has been taken, damaged, or destroyed for, or applied to, public use, without adequate compensation. *Berry v. City of Reno*, 107 S.W.3d 128, 133 (Tex.App.-Fort Worth 2003, no pet.). The Texas Constitution provides that no person's property is to be taken or applied to public use without adequate compensation's being made, unless by the consent of such person. *See* TEX. CONST. art. I, § 17. The constitution thereby waives governmental immunity from suit and creates liability "for the taking, damaging or destruction of property for public use." *City of Houston v. Boyle*, 148 S.W.3d 171, 177 (Tex.App.-Houston [1st Dist.] 2004, no pet.) (citing *Steele v. City of Houston*, 603 S.W.2d 786, 788–92 (Tex.1980)). To state a cause of action for inverse condemnation under the Texas Constitution, a claimant must allege (1) an intentional governmental act; (2) that resulted in his property's being taken, damaged, or destroyed; (3) for public use. *Little–Tex Insulation*, 39 S.W.3d at 598. Whether the facts of a particular case are sufficient to constitute a taking is a question of law. *Id.* We review questions of law *de novo*. *State v. Heal*, 917 S.W.2d 6, 9 (Tex.1996).

■■■■ A "taking" can take the form of a physical invasion of property or a regulation which imposes some limitation on how the property can be used. *Lowenberg v. City of Dallas*, 168 S.W.3d 800, 801 (Tex.2005) (per curiam). There are "several sharp distinctions between physical

---

4. In the interest of justice, we have also reviewed the record for evidence of Park's compliance with the notice requirements of the TTCA, as well as any pleadings identifying a waiver of sovereign immunity. Park does not cite us to evidence in the record, and we have been unable to locate evidence presented in Park's summary judgment response, to establish notice pursuant to section 101.101 of the Texas Civil Practice and Remedies Code.

We also note that, although he has not addressed the issues in his appellate brief, in Park's summary judgment response, he argued that "the Texas Tort Claims Act does not apply due to Section 101.056 of the Texas Civil Practice and Remedies Code." Section 101.056 is the legislature's expression that a governmental unit's performance or nonperformance of a discretionary act, defined as an act which the unit is not required by law to perform, is not subject to the waiver of immunity under the TTCA. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.056. Therefore, Park's state-

ment that the TTCA does not apply to discretionary acts is correct. However, the effect of the exception from the TTCA's limited waiver of sovereign immunity is that the City *does* enjoy immunity from suit for its discretionary acts. As this is the only provision which Park cited as a waiver of sovereign immunity, Park did not establish an applicable waiver in this case.

5. Park frames Issue Two in terms of a sufficiency-of-the-evidence challenge to the trial court's findings of fact and conclusions of law. The central issue in this case, according to Park's argument at trial, is whether the City's act of re-zoning the property constituted a "taking" under the Texas Constitution. Because the takings issue is a question of law, we will conduct a *de novo* review. *See General Servs. Comm'n v. Little–Tex Insulation Co.*, 39 S.W.3d 591, 598 (Tex.2001).

takings and regulatory takings." *Id.* Physical takings are "relatively rare, easily identified, and usually represent a greater affront to individual property rights." *Id.* at 801–02 (citing *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 324, 122 S.Ct. 1465, 1479, 152 L.Ed.2d 517 (2002)). In contrast, regulatory takings "are ubiquitous and most of them impact property values in some tangential way." *Id.* (citing *Tahoe–Sierra*, 535 U.S. at 324, 122 S.Ct. 1465).

 There are also analytical distinctions between different categories of regulatory takings. A regulatory taking that causes the property owner to suffer a "physical invasion" of his property gives rise to a right to compensation without a fact-specific analysis of the surrounding circumstances. *See Sheffield Dev. Co. v. City of Glenn Heights*, 140 S.W.3d 660, 671 (Tex.2004) (quoting *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992)). A property owner also suffers a taking when a regulation "denies all economically beneficial or productive use of land," which effectively denies the owner of the property itself.[6] *Id.* This second circumstance is limited to "the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted." *Id.* (citing *Tahoe–Sierra*, 535 U.S. at 330, 122 S.Ct. 1465) (emphasis in original). Determining whether a regulation has destroyed all economically viable uses of the property involves only the simple inquiry as to whether the restriction renders the property valueless. *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 935 (Tex.1998), *cert. denied*, 526 U.S. 1144, 119 S.Ct. 2018, 143 L.Ed.2d 1030 (1999). The mere fact that a regulation has destroyed the most profitable use of property does not establish a compensable taking. *See Taub v. City of Deer Park*, 882 S.W.2d 824, 826 (Tex.1994).

 Finally, a compensable regulatory taking can occur when a regulation unreasonably interferes with the property owner's right to use and enjoy the property. *Mayhew*, 964 S.W.2d at 935. The case before us falls in this third category of regulatory takings cases. Park argues that the City's regulation caused him to lose one of the economically beneficial uses of the property—indeed, to Park, its most economically beneficial use—to wit, the driving range. When a takings claim is based on an allegation that a regulation has destroyed only some of the property's value, through a restriction which only affects one or some of its economically viable uses, the court must examine the totality of the relevant circumstances and balance the public and private interests. *See Sheffield Dev. Co.*, 140 S.W.3d at 672.

 For guidance in this fact-specific analysis, we apply the three factors identified in *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). The *Penn Central* factors are: (1) "the economic impact of the regulation on the

---

**6.** *Sheffield Development* relied, in part, on the United States Supreme Court's opinion in *Agins v. City of Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980), to identify a third circumstance which entitled a property owner to compensation for a regulatory taking, without the need for a fact-specific analysis. *See Sheffield Dev. Co.*, 140 S.W.3d at 671. In circumstance three, a property owner could prove a taking, if the regulation at issue did not "substantially advance legitimate state interests." *Id.* Since *Sheffield Development*, the United States Supreme Court has overruled that portion of its *Agins* opinion. *See Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 540–41, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005). The Texas Supreme Court has not addressed whether the substantial advancement test remains valid for Texas Constitutional law purposes in light of *Lingle*.

claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action." *Sheffield Dev. Co.*, 140 S.W.3d at 672 (citing *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 225, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986) (quoting from *Penn Central*, 438 U.S. at 124, 98 S.Ct. 2646)). These factors are not exclusive and are not to be applied as a formulaic test. *Id.* (citing *Tahoe–Sierra*, 535 U.S. at 326–27 n. 23, 122 S.Ct. 1465). They serve merely as "important guideposts that lead to the ultimate determination whether just compensation is required." *Id.* That question turns on "whether the burden of regulation ought 'in all fairness and justice' to be borne by the public." *Id.* at 672–73 (quoting *City of Austin v. Teague*, 570 S.W.2d 389, 393 (Tex.1978)).

 We will begin by considering the economic impact of the City's re-zoning of Park's property. *See Sheffield Dev. Co.*, 140 S.W.3d at 677. While the government does not guarantee the profitability of each parcel of land subject to its authority, the value of the property and the severity of the economic impact on the property owner are both relevant factors to consider. *Id.* In assessing the value of the property and the severity of the economic impact on the property owner, we can also consider evidence of both lost investment and lost development profits. *Id.*

Park argues there is no evidence to prove that another use of the property was possible, making the economic hardship imposed by the regulation all the more severe. According to Park's testimony, however, the batting cages, putting green, and clubhouse continued to operate for nearly a year without the driving range, before the business closed. The record also shows that, subsequent to the foreclosure, the clubhouse has been used as a church, and the City has built a five-million gallon water tank on the site. Park admitted at trial that, following the Board of Adjustment's final decision denying the variance, he did not attempt to market the property for alternative development.[7] All this evidence indicates that the property retained at least some value without the driving range. Because Park did not attempt to sell the property during the year after the driving range closed and was therefore not able to testify regarding the specific amount of income lost when that occurred, there is no way to quantify the value lost. While there is little doubt that Park was impacted adversely due to the fence height limitation in the regulation, the lack of economic information, partly due to Park's inaction, weighs against him in the overall balance of public versus private interest. *See id.* at 672.

 Next, we consider whether Park had a reasonable, investment-backed expectation in the property. *See id.* at 677. In a regulatory taking case, the injury which gives rise to a right to compensation is caused by the passage of the ordinance that injures the property's value or usefulness. *See Lowenberg*, 168 S.W.3d at 802. The existing and permitted uses of the property constitute the primary expectation of the landowner that is affected by the regulation. *Mayhew*, 964 S.W.2d at 936. The zoning regulations in place at the time that the property owner bought the property are also to be considered.

---

**7.** According to Park's real estate valuation expert, the value of the seventeen-acre tract actually increased over the three years that Park owned it, from approximately $382,000 to approximately $450,000. The expert also testified that, based on his research, it would have been possible for another commercial enterprise to make profitable use of the property.

*Id.* As such, the historical uses to which the property has been put are "critically important" to our analysis. *Id.* at 937. We may also consider the property owner's knowledge of the existing zoning regulations. *Id.* at 936.

Park argues that his compliance with the building-permit and site-plan-approval processes, as well as the City's numerous inspections of the facility, all indicate he had a reasonable, investment-backed expectation to operate the driving range. Yet, all of the actions Park cites as evidence of his reasonable, investment-backed expectation took place after the property was re-zoned at his request.

Before Park began developing the property, it was a vacant lot and was being used as a local dumping ground. The property did not have a historical use as a driving range or as any other commercial venture. Given the fact that Park was the party who initiated the zoning change, before he began developing the property, it is fair to assume that he had some knowledge of the zoning regulations and restrictions already in place. Those regulations, including the UDC, limited development to residential uses, and they contained fence height restrictions.

Park understood very early in the development process that high fences were part of operating a driving range. He testified that, during his driving range research, he visited other facilities in Houston and Los Angeles, and, because those facilities had high fences, he did not think that a high fence in San Antonio would be a problem. He also testified that he understood that the average golfer usually drives a golf ball less than three hundred yards. His driving range was significantly less than three hundred yards, but, Park testified, "with fences we had enough coverage." Without the fences, Park could not operate his business. However, even with the new

zoning classification, the UDC prohibited fences above six feet. As such, at the time the City re-zoned the property at Park's request, he did not have a reasonable, investment-backed expectation of operating a driving range on the property.

Park argues that, under the analysis in the San Antonio Court of Appeals' recent opinion in *City of San Antonio v. El Dorado,* 195 S.W.3d 238 (Tex.App.-San Antonio 2006, pet. denied), he has suffered a regulatory taking, because, like the property owner in *El Dorado,* the City's regulatory action (1) denied him of all economically viable uses of the property, or (2) unreasonably interfered with his right to use and enjoy the property. In *El Dorado,* our sister court of appeals concluded that the claimant suffered a compensable regulatory taking when San Antonio changed the existing zoning classification, so that the property could no longer be used as a bar and lounge. *Id.* at 247. The court focused much of its factual takings analysis on the property's historical use as a bar. *Id.* at 246–47. According to the opinion, the property had been used as a bar continuously for eighteen years at the time the city re-zoned. *Id.*

The facts of *El Dorado* differ from Park's situation in several important respects. First, that property had an eighteen-year historical use before the regulatory change. *Id.* at 246–47. In the case before us, the property had no historical use as a driving range at the time of the re-zoning. Second, there is no indication in *El Dorado* that the property owner requested the zoning change. Indeed, the opinion indicates that the city re-zoned the property against the owner's wishes, in response to a "disturbance" on the property. *Id.* at 247. The fact that Park requested the regulatory action for which he now wishes to be compensated weighs heavily against the public's being required

to bear the economic burden of the regulation. *See Sheffield Dev. Co.*, 140 S.W.3d at 673.

 Park's request for the zoning change is also important to our consideration of the third *Penn Central* factor, the character of the government's action. *See id.* at 678. In *Sheffield Development,* the Texas Supreme Court expressed concern over the government's conduct in delaying the zoning decision for over a year in order to secure the votes needed to prevent the claimant's development. *Id.* at 679. Despite these concerns, however, the Court determined that the zoning decision itself, independent of the way it was reached, was not so different from other zoning decisions as to constitute a taking. *Id.* Similarly, while we would have preferred that the City had considered its own fence-height restrictions before approving the zoning change and Park's site plan, the regulatory act itself is not so far outside the zone of reasonableness as to constitute a taking, based on this factor alone.

There is no doubt that Park's situation is an unfortunate one. However, having reviewed the totality of the facts and circumstances in light of the *Penn Central* factors, we conclude that the City's actions following the re-zoning, which Park requested, were not ones which should, "in all fairness and justice," be paid for by the public. *See id.* at 672. Therefore, we hold there was no regulatory taking for which Park is entitled to compensation, and we overrule Issue Two. Having overruled both of Appellant's issues, we affirm the trial court's judgment.