NUMBER 13-09-00067-CV
COURT OF APPEALS
THIRTEENTH DISTRICT OF TEXAS
CORPUS CHRISTI - EDINBURG



| | |
|---|---|
| **CITY OF MCALLEN, TEXAS,** | **Appellant,** |

**v.**

| | |
|---|---|
| **ARNALDO RAMIREZ Jr., RAUL ROMERO, PROMOTIONS OF AMERICA, INC., NOLANA ENTERTAINMENT, INC.** | **Appellees.** |

**On appeal from the 93rd District Court
of Hidalgo County, Texas.**

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Benavides and Longoria
Memorandum Opinion by Chief Justice Valdez**

Arnoldo Ramirez Jr., Raul Romero, Promotions of America, Inc. ("Promotions"), and Nolana Entertainment, Inc. ("Nolana"), brought suit against the City of McAllen for "taking of property without due course of law or compensation" under article 1, section 17 of the Texas Constitution. *See* TEX. CONST. art. I, § 17 (establishing that "no

person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made . . . ."). After a bench trial, the trial court rendered judgment against the City of McAllen. The City appeals this judgment by eighteen issues. We affirm the trial court's judgment.

## I. BACKGROUND

The underlying events concern the operation of the Collage nightclub in Nolana Shopping Center in McAllen, Texas. Jose Chanin owned the center and served as Collage's landlord. Collage was owned and operated by Nolana, which was owned by Ramirez and Romero as equal shareholders. The genesis for the underlying suit occurred when the City denied Nolana's application to renew its conditional use permit to operate as a bar.

The City's zoning ordinances provide that the Nolana Shopping Center is zoned "C-3," which is a general business zone. The City's ordinances allow the operation of restaurant-bars in this area, including those that offer live entertainment; however, any alcohol-selling business which does not derive at least 51% of its gross income from the sale of prepared food, such as a bar or nightclub, is required to obtain a conditional use permit. McAllen Ordinances §§ 138–1, 138–278. According to the ordinances, the purpose of the regulations regarding the conditional use permit "is to allow the compatible and orderly development, within the city, of uses which may be suitable only in certain locations in a zoning district if developed in a specific way or only for a limited period of time." *Id.* § 138.111.

When an applicant applies for a conditional use permit, the city's planning director processes the application, investigates the application, provides notice to

2

owners of real property within 200 feet of the property for which application is being made, and presents the application with a recommendation to the planning and zoning commission. *Id.* § 138–112. The planning and zoning commission may deny an application after a public hearing if the proposed use fails to meet any of the criteria set forth in the ordinances for approval. *Id.* Whether the permit is granted or denied, any person aggrieved by the decision of the planning and zoning commission may appeal to the board of commissioners. *Id.* § 138–29. A conditional use permit, if granted, has a time limit of not more than one year unless otherwise approved by the board of commissioners. *Id.* § 138–117. At particular issue in this case is city ordinance section 138–118, which provides.

> The property line of the lot of any of the abovementioned businesses, especially those businesses having late hours (after 10:00 p.m.), must be at least 300 feet from the nearest residence, church, school, or publicly owned property, or must provide sufficient buffering and sound insulation of the building such that the business is not visible and cannot be heard from the residential area, and must be designed to prevent disruption of the character of adjacent residential areas.

*Id.* § 138–118(a)(4)(a).[1]

A brief history of the events underlying the creation of Collage is necessary to understand the sequence of events that followed. Before Collage was created, Ramirez, a businessman and entertainment promoter, originally owned all of the stock in Nolana, and he and his family also owned all of the stock in Promotions. Ramirez also had an interest in several other nightclubs and businesses. Nolana leased a space in the Nolana Shopping Center to open a restaurant-bar named Hot Spots. Nolana also leased a separate space in the same shopping center for a different restaurant, Fun

---

[1] The City has now changed this ordinance to expand the distance required from any specified business to the nearest residence, church, school, or publicly owned building, from three hundred to six hundred feet.

Time Pizza. In order to finance these businesses, Nolana took out a loan of $1 million from First State Bank. First State Bank was later sold to Texas State Bank. Nolana collateralized the loan with a property owned by Promotions known as La Villa Real. Of the loan amount, Ramirez allocated $600,000 as investment in Hot Spots and spent the remainder on Fun Time Pizza.

During this same period of time, Romero owned a restaurant called La Tortuga in the same shopping center. Ramirez and Romero began discussing their businesses, and in approximately 1997, Ramirez sold Romero half of his stock in Nolana. Ramirez and Romero planned to transform Hot Spots into a nightclub named Collage. Ramirez also sold Fun Time Pizza to Romero for $500,000. To finance the purchase, the terms of sale required Romero to assume responsibility for the remainder of the $1 million loan. According to Romero's testimony, he assumed responsibility for paying the existing debt, which at that time was approximately half a million.[2] Ramirez remained on the note as guarantor and remained involved in the business as a consultant and advisor.

Romero approached the City to obtain a building permit for remodeling Hot Spots. The City employees who responded to his request told him that he also needed to obtain a conditional use permit because its alcohol sales would exceed its food sales. The Mayor of the City of McAllen at that time, Leo Montalvo, informed Ramirez that there would be no problem in securing a conditional use permit.

On December 16, 1997, the City's planning and zoning Commission approved a request by Raul Romero for a conditional use permit for one year to operate a nightclub

---

[2] Ramirez testified that the remaining loan amount was approximately $450,000. We note that the City states in its brief that the debt had been paid down to approximately $880,000.

4

in the lease space formerly occupied by Hot Spots in the Nolana Tower Shopping Center. Romero originally executed the application in the name of a new and different corporation, Collage Enterprises, LLC, however, Romero never incorporated that entity. After Romero obtained the conditional use permit, Nolana immediately began to operate the lease space as Collage.

Thelma Gallegos, who resided on a street adjacent to the center, had complained vociferously about the shopping center from its inception. The shopping center had other tenants who offered live music. After Collage began operating, the number of her complaints and the complaints of other neighbors escalated. The complaints were not centered on music or noise in general, but were specifically directed against a bass thumping sound which they alleged emanated from Collage.

In a letter dated February 17, 1998, the City's planning and zoning commission notified Romero that the City had "received several citizen complaints concerning the establishment prompting an inspection of the property by a building official." The letter informed Romero:

> An inspection conducted on Wednesday, February 11, 1998 revealed that your establishment was in violation of the following requirement of your [conditional use permit]:
>
> > Sections 138–118(4)(a) "The property line of those businesses (bars), especially those businesses having late night hours (after 10:00 p.m.), must be at least 300 feet from the nearest residence, church, school, or publicly owned property, or must provide sufficient buffering and sound insulation of the building such that the building is not visible and cannot be heard from the residential area, and must be designed to prevent disruption to the character of adjacent residential areas."
>
> This letter is to advise you that the violation must be remedied within ten days from receipt of this letter. At that time, an inspection by a building

5

official will be conducted to ensure compliance with the terms of the [conditional use permit]. If the violation has not been corrected, the Planning and Zoning Commission will consider revocation of the [conditional use permit] at the next available public hearing.

At approximately this same time, Gallegos brought a petition seeking revocation of Collage's conditional use permit. At its May 5, 1998 meeting, the planning and zoning commission heard complaints from the neighbors, but denied revocation. The residents did not appeal this decision.

During this period of time, the neighbors called the police on multiple occasions to complain about noise from Collage. None of the police investigations resulted in any findings regarding noise violations or citations to Collage for violations of any ordinances. Testimony at trial indicated that some of these complaints were made on many occasions when Collage was closed or on evenings when it offered live comedy performances or showed sporting events rather than music. The neighbors instituted a complaint against Collage with the Texas Acoholic Beverage Commission ("TABC"), which conducted a full investigation; but the complaint was ultimately dismissed as unfounded. The TABC's office was directly across the street from Collage, and its director admitted that he heard no noise even during late nights working at the office.

Ramirez and Romero met several times with residents at their homes and at Collage to attempt to remedy the complaints. Romero testified that in his opinion, "the problem didn't exist." Ramirez concurred. Even though they did not agree that there was a problem, Ramirez and Romero nevertheless performed extensive renovations to Collage to attempt to remedy the complaints.

According to Romero's testimony, Montalvo was personally involved in the investigation and visited Collage "many times." He told them that they were not

6

violating any ordinances. He instructed Romero and Ramirez to hire engineers from New York to investigate and address the problem. They took measurements and suggested insulating the ceiling. According to Ramirez, Montalvo's law firm opened a "special" investigation about the complaints and told him numerous times not to worry about the situation.

Romero and Ramirez triple insulated the ceiling and walls. Marco Moreno, a carpenter, testified that Collage added three layers of sound boards in the walls and ceiling. They added several inches of insulation in the floor and ceiling and added sound proofing on the outside doors. They created double walls on the east side of the building, which was the side facing the neighbors, where they hollowed out the wall and filled it with sand. In sum, they spent more than $100,000 to reduce sound emanations from Collage.

Phil Fletcher, who installs and maintains audio systems, testified with regard to Collage, that "[n]obody else does that level of insulation." He testified that they reduced power to the speakers by fifty percent and put a limiter on the consoles, which was locked. The limiter cut the bass output of the speakers to twenty-five percent of their normal output. He also testified that they moved the speakers. According to Fletcher, you could hear the bass outside, but only if you were "pretty close" to the building.

Fernando Romeros, who at the time worked for the City as superintendent of building permits and inspections, inspected Collage in connection with the its permit for remodeling, and when his supervisors asked him to look into the noise complaints. He performed four or five different inspections. Romeros testified that he recalled that Collage had additional insulation installed to attempt to remedy the complaints. When

7

Romero personally investigated the noise complaints, he stood in the alley by Collage, approximately 300 feet away, but did not hear any music or sound or bass thumping. He verified that Collage was open at this time. When he stood on the porch area at Collage itself, all of the noise and sound he heard emanated from vehicles on the street on Nolana or in the parking lot.

Ramirez and Romero retained Jim Melhart to determine if there was a problem with sound emanation from the club. Melhart, a specialist in the music business and manufacturing equipment for the music industry, testified that he investigated the complaints regarding Collage. When he initially visited the establishment, he found a small problem with noise emanating from the roof. Ramirez and Romero installed insulation, sound boards and a drop ceiling. When Melhart returned to Collage in November or December, he heard no sound outside the building until he was fifteen feet away from it. Specifically, he took decibel readings and obtained no results until he tested within fifteen feet of the building. He visited Collage three times in November and December and never heard any bass thumping noises emanating from Collage. On one occasion, he visited a home which had complained about the noise and heard nothing. The daughter of the occupant said that she had not heard the "bass thumping" noise in a few months.

Julianne Rankin, the administrator of urban development for the City, testified that she was in charge of the planning, field and premises inspection, and health departments. Her department studies applications for conditional use permits and makes recommendations on them to the planning and zoning commission, which is an

8

advisory board appointed by the city commission to review and make recommendations on zoning issues.

Rankin testified that the Nolana Shopping Center is zoned C-3 general business, which is a commercial retail category. She testified that restaurants are a permitted use in this zone and nightclubs are allowed by conditional use. In accordance with the ordinances, a restaurant can nevertheless play music so long as at least fifty-one percent of its revenue comes from food sales. According to Rankin, the center is located at the intersection of Nolana and Tenth Street, which is one of the most highly trafficked intersections in McAllen. At the time of the events at issue in this case, the center included Collage, Guacamaya's, a restaurant with live music, and another bar that played music, the Yacht Club.

Rankin testified that the Yacht Club, a bar that was also located in Nolana Shopping Center, had received complaints about noise over the years from neighboring residents. When the Yacht Club's conditional use permit recently came up for renewal, the city commission voted to renew the permit despite ongoing complaints. In accordance with the renewal, however, the city staff visits the Yacht Club to monitor its noise levels with a sound meter three times per month. Rankin acknowledged that the city staff did not do this for Collage, but asserted that they did not have sound meter equipment at that time.

Rankin provided further testimony that the city commission denied a conditional use permit for a bar named Papi's because of noise complaints. When Prada's, a different establishment, opened in that same location as Papi's, the city continued to receive noise complaints about that location. The planning and zoning commission

9

voted to deny the conditional use permit because of the neighbor complaints, however, the city commission nevertheless approved the conditional use permit.

In November 1998, Romero applied to renew Collage's conditional use permit. The staff recommended that the permit be renewed. On January 5, 1999, the planning and zoning commission met. At the meeting, residents offered complaints about the noise allegedly emanating from the center. The commission voted to deny the renewal of the conditional use permit. Romero appealed that determination to the city commission. Collage ceased operating after the permit was denied and during the pendency of the appeal. Romero testified that their lawyers ordered them to stop operating the business and that they believed the City had ordered them to stop doing business. Romero further testified that their landlord, Chanin, told them they could not open Collage because of the City's order.

On February 9, 1999, the city commission met. Neighbors again appeared and complained about noise. The city commission accepted the recommendation of the planning and zoning commission, and denied renewal of the conditional use permit.

On February 18, 2000, Ramirez, Romero, Nolana, and Promotions brought suit against the City. They alleged that the City's denial of the request to renew the conditional use permit was "arbitrary and capricious" and amounted to a taking in violation of Texas Constitution article 1, § 17.

At the time of suit, Nolana was "not in good standing." After suit was filed, Nolana forfeited its corporate privileges on March 12, 2000 and forfeited its charter on

August 25, 2000. At the time of suit, Promotions was delinquent. Its privileges were forfeited on March 19, 2002.[3]

The trial court held a lengthy bench trial on this matter. More than a dozen witnesses offered testimony and the parties offered extensive documentary evidence. Several of the neighboring residents appeared and offered testimony regarding the bass thumping noises that they believed emanated from Collage. At trial, Romero testified that he believed that certain improprieties resulted in the city commission's denial of the conditional use permit. He pointed out that Montalvo did not appear at the city commission's hearing on Collage's renewal request. Romero testified that Montalvo, an attorney, represented Chanin and his corporations, and that Chanin benefited from denying Collage's conditional use permit because he would retain the substantial improvements to the leasehold at Collage when it closed. One of the city commissioners, Carlos Garza, had a close relationship with Thelma Gallegos, the primary complainant regarding Collage. Garza was also president of a bank which was financing one of Collage's direct business competitors, and Romero testified that Garza's decision to deny Collage's conditional use permit therefore operated to benefit him.

The trial court rendered judgment in favor of appellees. The trial court entered the following findings of fact and conclusions of law:

---

[3] Section 171.251 of the Texas Tax Code provides that the comptroller "shall forfeit the corporate privileges" of a corporation that fails to file specific reports, fails to pay taxes or penalties, or fails to permit inspection of corporate records. TEX. TAX CODE ANN. § 171.251 (West 2008). If a corporation's privileges are forfeited, the corporation "shall be denied the right to sue or defend in a court of this state" and directors and officers are personally liable for corporate debts. *See id.* § 171.252 (West 2008).

11

# FINDINGS OF FACT

1. That the City staff recommended that the conditional use permit for Collage be granted.

2. That all persons who complained of bass vibrations coming from Collage live more than 700 feet from the club.

3. That there is another club in the same mall, The Yacht Club, which has live music and which has residents within 200 feet of the club.

4. That those residents have complained of the club and the conditional use permit for the Yacht Club has never been revoked or failed to be granted.

5. That an owner of the Yacht Club and owner of the mall where the Yacht Club is [were] represented by attorney Leo Montalvo.

6. That the person who complained the most about Collage is a close friend and former business associate of one of the City Commissioners who voted to deny the permit for Collage.

7. That Carlos Garza, the City Commissioner, was outspoken in opposition to the conditional use permit.

8. That there had been no sound coming from Collage for more than seven (7) months prior to the denial of the conditional use permit.

9. That the only complaints about sound coming from Collage were more than seven (7) months old.

10. That there are no verifications of any complaints by either the McAllen Police of the Texas Alcoholic Beverage Commission.

11. That the noise complaint was filed against Collage by Thelma Gallegos with the Texas Alcoholic Beverage Commission.

12. That the Texas Alcoholic Beverage Commission investigated the complaint and dismissed the complaint.

13. That at the hearing before the planning and zoning board, a planning and zone board member lied about having heard noise in front of the house of Thelma Gallegos. The board member was a co-worker of Thelma Gallegos.

14. That the planning and zoning board relied on his statements to deny the permit.

15. That in denying the permit to the plaintiffs, the Commission referred to the statements by the planning and zoning board member.

16. That city staff responded to complaints of bass vibration and found no evidence of bass vibration.

17. That city staff required renovations to Collage to lessen bass vibration.

18. That Collage complied with all requests and did extensive renovations to limit the possibility of bass vibration escaping the club.

19. That Raul Romero spent approximately more than $250,000.00 renovating Collage with most of it going towards reducing sound.

20. That the only deep bass sound heard by city staff in the vicinity of the club came from automobiles either in the parking lot or driving along Nolana or 6th Street.

21. That Jim Melhart of Melhart music performed numerous sound readings in the vicinity of Collage and inside Collage.

22. That Jim Melhart is an expert in sound, especially bass sound and is the owner of a major patent on bass sound equipment.

23. That Jim Melhart found no evidence outside Collage of excessive bass sound.

24. That the complainants of Collage, particularly Thelma Gallegos, lived on Shasta Street.

25. That Jim Melhart found no evidence of bass sound or bass vibration on Shasta Street more than 700 feet away from Collage.

26. That Jim Melhart did his sound readings with the most sophisticated equipment that picks up all deep bass readings.

27. That Jim Melhart did his sound readings and investigations in November and December, 1999, shortly before Collage was [shut] down.

28. That Thelma Gallegos and her daughter admitted to Jim Melhart that they had not heard or felt any bass vibration for more than six (6) months prior to December 1999, when he was doing his investigation.

13

29. That Jim Melhart's bass readings were well below the decibel levels allowed by City ordinances.

30. That the City Commission heard and accepted evidence that the owners of Collage had done nothing to improve the sound.

31. That the City staff had advised both the planning and zoning board and the City Commission that the owners of Collage had made excessive renovations to reduce the sound.

32. That Nano Ramirez had been advised by Leo Montalvo, the Mayor of McAllen that the conditional use permit would be no problem.

33. That Nano Ramirez committed himself to a million dollars in loans and put up the Villa Real as collateral only after the assurances of the Mayor of McAllen, Leo Montalvo.

34. That other nightclubs in the area have had numerous complaints, including the Yacht Club which is almost next door to Collage, and still were issued permits. Nightclubs such as the Yacht Club, Hooligans have had more verifiable complaints than Collage and still have retained their conditional use permit.

35. That the City acted arbitrarily and capriciously in denying the conditional use permit of Collage.

36. That as a result of the arbitrary and capricious actions of the defendant City of McAllen, the plaintiffs suffered damages as follows:

    a. The plaintiffs had an agreement to sell Collage that was contingent upon getting the conditional use permit. As a result of failing to complete the sale, plaintiff Romero lost $250,000.00 which he invested in the club to provide the sound installation as required by the City.

    b. Romero owed Ramirez $350,000.00 that was to be paid from the sale. This was lost.

    c. Arnaldo Ramirez made a $1,000,000.00 loan agreement with Texas State Bank for Collage in which La Villa Real was put up as collateral. The loan was to be paid from the proceeds of the sale of Collage. The loan was made in reliance on representations that promises were made from the Mayor of McAllen that the conditional use permit would be granted.

14

d.  As a result of the refusal to grant the conditional use permit application, the sale did not go through and Ramirez could not pay the loan.  Texas State Bank foreclosed and La Villa Real was lost.

e.  La Villa Real had a value of $1,500,000.00 at the time.  La Villa Real was owned by Promotions of America, Inc. Arnaldo Ramirez is the successor to Promotions of America as the primary shareholder.

f.  Arnaldo Ramirez and Raul Romero are successors to Nolana Entertainment, Inc. as sole shareholders.  At the time of the $1,000,000.00 loan and the refusal to grant the conditional use permit, Arnaldo Ramirez and Promotions of America, Inc. had a written agreement to lease La Villa Real to the Graham Brothers (Graham Central Station) for ten years at $17,000.00 a month.  This was lost.

## CONCLUSIONS OF LAW

That Nolana Entertainment, Inc. d/b/a Collage complied with all ordinances relevant to its conditional use permit and complied with all requests by city staff regarding sound and bass vibration.

That the City did not follow its own ordinances in denying the conditional use permit to Collage.

Because of the arbitrary and capricious actions of the City, the denial of the conditional use permit is an unconstitutional taking under the Texas Constitution.

The trial court's judgment concludes that the City is "liable to the plaintiffs in the above amounts for the total amount of 4.5 million dollars plus interest which represents the damages to Raul Romero of $250,000.00, $350,000.00 to Arnaldo Ramirez, plus the value of La Villa Real, 1.5 million dollars to Arnaldo Ramirez, and lost rentals to the Graham Brothers in the amount of 2.4 million dollars in favor of Arnaldo Ramirez."  The judgment further provides that interest is to "accrue at [the] rate of 4.5% starting on July 1, 1999 until paid."

15

## II. STANDARD OF REVIEW

In an appeal of a bench trial, findings of fact issued by the trial court have the same force and effect as a jury verdict. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). We apply the same standards in reviewing the legal and factual sufficiency of the evidence supporting the trial court's fact findings as we do when reviewing the legal and factual sufficiency of the evidence supporting a jury's answer to a jury question. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996) (per curiam); *Main Place Custom Homes, Inc. v. Honaker*, 192 S.W.3d 604, 614 (Tex. App.—Fort Worth 2006, pet. denied).

In reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the fact finding, crediting favorable evidence if reasonable persons could, and disregarding contrary evidence unless reasonable persons could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 822, 827 (Tex. 2005). We may not sustain a legal sufficiency, or "no evidence" point unless the record demonstrates that: (1) there is a complete absence of a vital fact; (2) the court is barred by the rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence to prove a vital fact is no more than a scintilla; or (4) the evidence established conclusively the opposite of the vital fact. *Id.* at 810.

To evaluate the factual sufficiency of the evidence, we consider all the evidence, and will set aside the finding only if the evidence supporting the finding is so weak or so against the overwhelming weight of the evidence that the finding is clearly wrong and unjust. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). Unchallenged findings of fact are

16

binding on an appellate court unless the contrary is established as a matter of law or there is no evidence to support the finding. *See McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696–97 (Tex. 1986). As the fact finder, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Id.*

We review a trial court's conclusions of law de novo. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002); *Busch v. Hudson & Keyse, LLC*, 312 S.W.3d 294, 299 (Tex. App.—Houston [14th Dist.] 2010, no pet.). We exercise our own judgment on each issue and afford no deference to the original tribunal's decision. *See Quick v. City of Austin*, 7 S.W.3d 109, 116 (Tex. 1999). We review conclusions of law to determine whether the conclusions drawn from the facts are correct. *Zagorski v. Zagorski*, 116 S.W.3d 309, 314 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (op. on reh'g). If the reviewing court determines a conclusion of law is erroneous, but the trial court rendered the proper judgment, the erroneous conclusion of law does not require reversal. *BMC Software*, 83 S.W.3d at 794; *Busch*, 312 S.W.3d at 299; *see KCCC Props. v. Quality Vending, Inc.*, 312 S.W.3d 231, 235 (Tex. App.—Amarillo 2010, pet. denied) (observing that erroneous conclusions of law need not prompt reversal if judgment can be sustained on any legal theory supported by evidence); *In re J.J.L.-P.*, 256 S.W.3d 363, 376 (Tex. App.—San Antonio 2008, no pet.). We uphold conclusions of law if the judgment can be sustained on any legal theory supported by the evidence. *Busch*, 312 S.W.3d at 299.

### III. STANDING

In its first three issues, the City contends that Ramirez and Romero lack standing to recover for the alleged wrongful taking. The City's first three issues specifically state:

17

Appellee Ramirez has no standing to recover the awards of $1.5 million for lost value of the Villa Real property and $2.4 million in lost rentals [for] the Villa Real property because the evidence is legally and factually insufficient to support (1) Finding No. 36.E that Ramirez was the successor to Promotions of America[;] or (2) any implied finding that Ramirez owned the Villa Real property or otherwise had standing to recover those damages. The overwhelming or conclusive evidence proved that Promotions of America owned the Villa Real property and that shareholders in addition to Ramirez owned Promotions of America, and the District Court therefore erred in awarding those damages to Ramirez. Because Ramirez lacked standing, the District Court had no jurisdiction to award him any damages.

Appellees Ramirez and Romero have no standing to recover the awards of $250,000 for lost investment in Collage and $350,000 lost profits from the anticipated sale of Collage because the evidence is legally and factually insufficient to support (1) Finding No. 36.F that Ramirez and Romero were successors to Nolana Entertainment[;] or (2) any implied finding that Ramirez or Romero owned the Nolana leasehold or that they had standing to recover those damages. The overwhelming or conclusive evidence proved that Nolana Entertainment owned the Nolana leasehold and the Collage establishment, and the District Court therefore erred in awarding those damages to Ramirez and Romero. Because Ramirez and Romero lacked standing, the District Court had no jurisdiction to award them any damages.

The evidence is legally or factually insufficient to demonstrate that the City's failure to renew the [conditional use permit] for the Nolana leasehold resulted in a TEX. CONST. art. 1, § 17 "taking" loss to Appellees Romero and Ramirez, and the District Court erred in promulgating its Findings Nos. 36.A and 36.B and was without jurisdiction to award Romero $250,000 for such alleged loss or to award Ramirez $350,000 for such alleged loss.

In support of these issues, the City contends that Nolana and Promotions owned the properties for which damages were awarded, and because Ramirez and Romero never dissolved those corporations, they were not "successors" to the corporations and did not have a vested interest in the property or standing to recover for taking losses thereto. The City thus contends that the trial court lacked jurisdiction to award Ramirez and Romero any relief.

18

A party's standing to pursue a cause of action is a question of law we review de novo. *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex. 1998); *AVCO Corp. v. Interstate Sw., Ltd.*, 251 S.W.3d 632, 649 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). The general test for standing in Texas requires that there be a real controversy between the parties that will be actually determined by the judicial declaration sought. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993). A plaintiff has standing to sue if: (1) the plaintiff has sustained, or is immediately in danger of sustaining, some direct injury as a result of a complained-of wrongful act; (2) there is a direct relationship between the alleged injury and the claim asserted; (3) the plaintiff has a personal stake in the controversy; (4) the challenged action has caused the plaintiff some injury in fact; or (5) the plaintiff is an appropriate party to assert both its own interest and the public interest in the matter. *AVCO Corp.*, 251 S.W.3d at 649; *El Paso Cmty. Partners v. B & G/Sunrise Joint Venture*, 24 S.W.3d 620, 624 (Tex. App.—Austin 2000, no pet.). In reviewing the trial court's ruling on the issue of standing, we construe the pleadings in the plaintiff's favor and consider the pleader's intent. *County of Cameron v. Brown*, 80 S.W.3d 549, 555 (Tex. 2002). In addition, courts "may consider evidence and must do so when necessary to resolve the jurisdictional issues raised." *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000).

Standing is not to be confused with capacity.[4] "A plaintiff has standing when it is personally aggrieved, regardless of whether it is acting with legal authority; a party has

---

[4] Incapacity must be challenged with a verified plea or else it is waived. *See* TEX. R. CIV. P. 93(1); *Lighthouse Church of Cloverleaf v. Tex. Bank*, 889 S.W.2d 595, 600 (Tex. App.—Houston [14th Dist.] 1994, writ denied). This rule favors abatement over dismissal and affords corporations an opportunity to cure the defect by paying their delinquent taxes or requesting that their forfeiture be set

capacity when it has the legal authority to act, regardless of whether it has a justiciable interest in the controversy." *Nootsie, Ltd. v. Williamson County Appraisal Dist.*, 925 S.W.2d 659, 661 (Tex. 1996). Capacity concerns a party's personal right to come into court, whereas standing concerns the question of whether a party has an enforceable right or interest. *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 849 (Tex. 2005) Thus, a plaintiff with no legally cognizable interest in the outcome of the case lacks standing to sue on its own behalf, but may be authorized to sue on behalf of another. *See Nootsie*, 925 S.W.2d at 661; *see also Neeley v. W. Orange-Cove Consol. Indep. Sch. Dist.*, 176 S.W.3d 746, 776 (Tex. 2005) ("[A] party's standing to assert a claim does not depend on its ability or willingness to look out for interests other than its own.").

The general rule in Texas is that a corporate shareholder has no individual cause of action for damages caused by a wrong done solely to the corporation. *Wingate v. Hajdik*, 795 S.W.2d 717, 719 (Tex. 1990); *Haut v. Green Cafe Mgmt.*, No. 14-10-01224-CV, 2012 Tex. App. LEXIS 4613, at *13 (Tex. App.—Houston [14th Dist.] June 12, 2012, no pet.) (op.); *Perry v. Cohen*, 285 S.W.3d 137, 144 (Tex. App.—Austin 2009, pet. denied); *Corona v. Pilgrim's Pride Corp.*, 245 S.W.3d 75, 78–79 (Tex. App.—Texarkana 2008, pet. denied) (holding that counterclaims for harm done to corporation belonged to corporation, not shareholder and guarantor of corporation and could not be asserted by shareholder and guarantor in creditor's suit on sworn account); *see also*

---

aside. *See Lighthouse Church*, 889 S.W.2d at 600 ("Resort to a motion for dismissal should not be granted until the cause of action has been abated, the plaintiff has been given an opportunity to cure the defect, and has failed to do so."); *Cont'l Contractors, Inc. v. Thorup*, 578 S.W.2d 864, 866 (Tex. Civ. App.—Houston [1st Dist.] 1979, no writ) ("A plaintiff's right to maintain the suit in the capacity in which he sues is properly raised by a plea in abatement, not by a motion for dismissal."). The City challenged appellees' capacity by way of verified pleading, but did not file a motion to abate.

*Mossler v. Nouri*, No. 03-08-00476-CV, 2010 Tex. App. LEXIS 4065, at *11 (Tex. App.—Austin May 27, 2010, pet. denied) (mem. op.) (shareholders who were parties individually to lease were not entitled to recover because damages were attributable to injury to corporation rather than to individual shareholders). Causes of action for injury to the property of a corporation or for impairment or destruction of its business are vested in the corporation, as distinguished from its shareholders, even though the shareholders may be harmed indirectly by a loss of earnings. *Wingate*, 795 S.W.2d at 719; *Haut,* 2012 Tex. App. LEXIS 4613, at *13; *Redmon v. Griffith*, 202 S.W.3d 225, 233 (Tex. App.—Tyler 2006, pet. denied). This general rule applies even if the corporation is wholly-owned. *See Wingate*, 795 S.W.2d at 718–19; *Lamajak, Inc. v. Frazin*, 230 S.W.3d 786, 794 (Tex. App.—Dallas 2007, no pet.).

It is the nature of the wrong, whether directed against the corporation only or against the shareholder personally, not the existence of injury, which determines who may sue. *Haut,* 2012 Tex. App. LEXIS 4613, at *13; *Redmon*, 202 S.W.3d at 234. A stockholder may recover damages for wrongs done to him individually "where the wrongdoer violates a duty arising from contract or otherwise, and owing directly by him to the stockholder." *Wingate*, 795 S.W.2d at 719 (quoting *Massachusetts v. Davis*, 140 Tex. 398, 168 S.W.2d 216, 221 (1942)). However, where the shareholders lack standing to pursue causes of action belonging to the corporation, the trial court lacks jurisdiction to render judgment awarding them damages individually on those causes of action. *See Wingate*, 795 S.W.2d at 719; *see also Mossler*, 2010 Tex. App. LEXIS 4065, at *11.

21

As a general rule, corporations that file suit, then forfeit their right to do business, retain the right to continue an action filed while the corporation was authorized to do business. *See Rushing v. Int'l Aviation Underwriters, Inc.*, 604 S.W.2d 239, 241–42 (Tex. Civ. App.—Dallas 1980, writ ref'd n.r.e.); *Deveny v. Success Co.*, 228 S.W. 295, 296 (Tex. Civ. App.—San Antonio 1921, writ ref'd); *see also Tex. Clinical Labs, Inc. v. Leavitt*, 535 F.3d 397, 405 (5th Cir. 2008); *Mossler*, 2010 Tex. App. LEXIS 4065, at **17–19. However, otherwise, a forfeiture of corporate privileges deprives a corporation of the capacity to sue. *El T. Mexican Rests., Inc. v. Bacon*, 921 S.W.2d 247, 249–50 (Tex. App.—Houston [1st Dist.] 1995, writ denied).

When a corporation forfeits its privileges, title to its assets, including its causes of action, is bifurcated; legal title remains with the corporation and the beneficial interest is vested in its shareholders. *See id.* (citing *Regal Constr. Co v. Hansel*, 596 S.W.2d 150, 153 (Tex. Civ. App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.)). While the corporation no longer has the legal right (i.e., capacity) to assert its causes of action in court, the shareholders, as holders of beneficial title, have capacity to assert the corporation's causes of action as its representatives and "prosecute or defend such action in the courts as may be necessary to protect [their] property rights." *Humble Oil & Ref. Co. v. Blankenburg*, 149 Tex. 498, 235 S.W.2d 891, 894 (Tex. 1951); *see Bacon*, 921 S.W.2d at 251–52, *Regal Constr. Co.*, 596 S.W.2d at 153. This entitlement to prosecute and defend actions in Texas state court is what is meant by "capacity." *Bacon*, 921 S.W.2d at 251. Thus, capacity to sue devolves upon the shareholders of a corporation when that corporation becomes incapacitated; however, standing to sue does not devolve upon the shareholders, and they must sue as representatives of the corporation, which

22

still owns legal title to its cause of action. *See id.* at 251–52. In other words, this entitlement to go into court for the corporation does not amount to the right to recover individually on the corporate cause of action. *Id.* For a shareholder to recover on a cause of action for injury that is vested in a corporation, a shareholder must bring the suit derivatively in the name of the corporation to ensure that each shareholder is made whole if the corporation obtains compensation from a wrongdoer. *Thaw v. Schachar*, No. 07-10-00027-CV, 2011 Tex. App. LEXIS 5726, at **10–11 (Tex. App.—Amarillo July 26, 2011, pet. denied) (op.); *Swank v. Cunningham*, 258 S.W.3d 647, 661 (Tex. App.—Eastland 2008, pet. denied).

A shareholder may, however, have the right to recover individually on a corporate cause of action when the shareholder is a successor in interest to the corporation. A shareholder may become the owner of the corporation's rights either by conveyance or by operation of law upon the corporation's dissolution. *Courseview, Inc. v. Phillips Petroleum Co.*, 312 S.W.2d 197, 203 (Tex. 1958), *see also Carpaint, Inc. v. Pelican Partners, L.P.*, No. 13-07-00751-CV, 2008 Tex. App. LEXIS 6869, at **13–14 (Tex. App.—Corpus Christi Aug. 28, 2008, pet. denied). Upon dissolution, the assets of a dissolved corporation naturally pass to the shareholders. *See Courseview*, 312 S.W.2d at 202–03. Nevertheless, "[i]f a shareholder acquires beneficial title to corporate assets by the corporation's forfeiture of corporate privileges, when such privileges may still be revived, this shareholder is not properly a 'successor in interest' that can recover personally on a corporation's cause of action.'" *Bacon*, 921 S.W.2d at 252, *see also Carpaint, Inc.*, 2008 Tex. App. LEXIS 6869, at **15–16.

In the instant case, the pleadings and evidence show the following. The plaintiffs' original petition, brought by Ramirez, Romero, Promotions, and Nolana, was filed on February 18, 2000. The petition sought damages on behalf of all plaintiffs.

Nolana owned and operated Collage. Ramirez and Romero each owned fifty percent of the shares of Nolana. Romero actively managed Collage and Ramirez served as consultant. Both men had substantial assets invested in Collage and served as guarantors for its financing. According to state records, Nolana was not in good standing and was "delinquent" on November 16, 1999, and forfeited its existence in March 2000 and again on August 25, 2000.

Promotions had three stockholders: Ramirez, his mother, and his uncle, Arturo Guerra. Promotions owned Villa Real. According to state records, Promotions had its corporate privileges forfeited on March 14, 2000, revived its corporate privileges on May 9, 2000, forfeited its corporate privileges again on March 19, 2002, and was "not in good standing" as of November 16, 2001. Promotions had a history of delinquency, forfeiture, and then reinstatement that preceded the events at issue in this lawsuit.

The original conditional use permit, which was approved, was made out by Romero in the name of Collage but the permit attached to Nolana. The renewal for the conditional use permit which was denied was completed by Romero and again attached to Nolana. Both Ramirez and Romero invested heavily in Collage and served as personal guarantors of its debts.

The trial court awarded Romero $250,000.00 as "money invested in the business for the purpose of complying with City ordinances and staff requests." The trial court awarded Ramirez $350,000.00 "as a result of money owed by Raul Romero that was to

24

be paid from the profits of the company" and that "the plaintiffs had a buyer for the business that would have paid the $350,000.00 to [Ramirez] upon the sale of the establishment." The trial court awarded $1.5 million to Ramirez based on the fact that he borrowed $1,000,000.00 from Texas State Bank for the purpose of investment in the business; he defaulted on the loan due to the denial of the conditional use permit and the closure of Collage; and Texas State Bank foreclosed on La Villa Real, which had been valued at $1.5 million. The trial court further awarded Ramirez $2.4 million representing the loss of a lease of La Villa Real at $17,000.00 per month for ten years.

In this case, we must determine whether the causes of action are vested in the corporations as injury to the property of a corporation or for impairment or destruction of its business, as distinguished from the corporation's shareholders, even though the shareholders may be harmed indirectly by a loss of earnings, or whether the causes of action are owned by the shareholders themselves for wrongs done to them individually because the City violated a duty, arising from contract or otherwise, and owing directly by the City to the individual stockholders.

We conclude that the causes of action alleged in this case are for injury to Collage, as owned and operated by Nolana, rather than personal injuries to Ramirez and Romero. Although it is evident that Ramirez and Romero suffered financial harm from the City's actions, the events at issue herein are not based on a legal duty owed directly by the City to these individuals. Rather, the City's actions pertained directly to Collage, which was owned and operated by Nolana.

The City contends that Ramirez and Romero, as shareholders of non-dissolved corporations which have forfeited their charters, do not have standing to individually

25

recover for corporate property losses. In support of its argument, it cites our decision in *Carpaint, Inc. v. Pelican Partners, L.P.*, 2008 Tex. App. LEXIS 6869. In *Carpaint*, a husband and wife were the sole shareholders of a corporation that owned a house. *Id.* at *1. A developer constructed a dam, which flooded the house and property. *Id.* at *2. The corporation forfeited its corporate charter in 1998. *Id.* at *2 n.2. The husband and wife brought suit in 2001. *Id.* at *3. The trial court granted summary judgment in favor of the developer on grounds that the husband and wife did not have standing to assert claims for damages sustained by the property since Carpaint owned the property. *Id.* The husband and wife amended the petition to add Carpaint as a plaintiff and asserted that they were owners of an equitable interest in the home. *Id.* at *4. The trial court again granted summary judgment in favor of the developer. *Id.* at *5.

On appeal, we concluded that because Carpaint did not appear to have been dissolved and its corporate charter was still subject to revival when the suit was first filed, the Laguartas were not successors in interest to Carpaint's assets, and Carpaint maintained legal title to its assets, including the home and the causes of action pertaining to the home. *Id.* at **12–13 (citing *Regal Constr. Co.*, 596 S.W.2d at 153). Moreover, because the Laguartas did not institute their suit on behalf of Carpaint as a derivative action, we concluded that the Laguartas did not have standing to bring suit. *Id.* at *16.

> Essentially, because it owned the legal title to the home and the corresponding cause of action, Carpaint had standing to sue; however, it could not do so because it lacked capacity at the time the suit was initiated because it had forfeited its corporate privileges on August 25, 1998. The Laguartas, as the sole shareholders of Carpaint, owned beneficial title to the home and had capacity to sue, but they lacked standing to sue individually on the corporation's cause of action.

26

*Id.* at *17–18 n.10 (citations omitted).

We conclude that *Carpaint* does not control our analysis in this case. In *Carpaint*, the corporate charter was forfeited at the time suit was filed, but had been reinstated prior to judgment in the case. Accordingly, the corporation had the standing and capacity to litigate its own causes of action, but did not do so. In the instant case, neither Nolana nor Promotions had its corporate charter forfeited prior to suit or reinstated during suit. *See Rushing*, 604 S.W.2d at 241–42; *Deveny*, 228 S.W. at 296.

We nevertheless agree with the City in its assertion that the trial court erred in determining that Ramirez and Romero were successors to their corporate entities. The trial court's conclusions of law conclude that "Arnaldo Ramirez is the successor to Promotions of America as the primary shareholder" and "Arnaldo Ramirez and Raul Romero are successors to Nolana Entertainment, Inc. as sole shareholders." The evidence in this case fails to show that either corporation was dissolved or that there was a conveyance of rights from the corporations to its shareholders, and accordingly, neither Ramirez nor Romero were successors in interest to the corporations such that they had standing to sue individually for damages to corporate property. *See Courseview*, 312 S.W.2d at 202–03; *Bacon*, 921 S.W.2d at 252; *see also Carpaint, Inc.*, 2008 Tex. App. LEXIS 6869, at **12–13.

Even though the trial court's conclusion of law was erroneous, an erroneous conclusion of law does not require reversal where the judgment can be sustained on any legal theory supported by the evidence. *See BMC Software*, 83 S.W.3d at 794; *Busch*, 312 S.W.3d at 299; *KCCC Props.*, 312 S.W.3d at 235. The uncontradicted

evidence in this case shows that both Promotions and Nolana were closely held corporations. The Texas Business Organizations Code provides that:

If justice requires:

(1)     a derivative proceeding brought by a shareholder of a closely held corporation may be treated by a court as a direct action brought by the shareholder for the shareholder's own benefit; and

(2)     a recovery in a direct or derivative proceeding by a shareholder may be paid directly to the plaintiff or to the corporation if necessary to protect the interests of creditors or other shareholders of the corporation.

TEX. BUS. ORG. CODE ANN. § 21.563 (West 2011). This statute does not change prior law and does not allow a shareholder to prosecute an individual claim for injuries that are vested in the corporation. *See Swank*, 258 S.W.3d at 665. Nevertheless, this statute allowed the trial court to render judgment in favor of appellees as a recovery in a direct proceeding by a shareholder. *See id.* We overrule the City's first three issues.

### IV. TAKING

The City's issues numbered four through sixteen attack the trial court's conclusion that there was a compensable taking. These issues are as follows:

4.   The evidence is legally or factually insufficient to demonstrate or support an implied finding that the City physically occupied or damaged either the Nolana leasehold, the Collage establishment, or the Villa Real property, and the District Court reversibly erred in entering judgment awarding damages on the basis of any such implied finding.

5.   The evidence is legally or factually insufficient to demonstrate or supply an implied finding that the City exacted any monetary or other benefit from appellees as a condition to the issuance or renewal or a [conditional use permit], and the District Court reversibly erred in entering judgment awarding damages on the basis of any such implied finding.

6.   The evidence is legally or factually insufficient to demonstrate or support any implied finding that the City regulated either the Nolana

28

leasehold, the Collage establishment, or the Villa Real property in a manner which denied all beneficial or productive use of any such property, and the District Court reversibly erred in entering judgment awarding damages on the basis of any such implied finding.

7. The evidence is legally or factually insufficient to demonstrate or support an implied finding that the City regulated the Villa Real property at all, or that the owner of the Villa Real property otherwise had any standing to complain of the City's decision to not renew a [conditional use permit] for the unrelated NEI Corporation's Nolana leasehold property, and the evidence is therefore legally or factually insufficient to demonstrate that a compensable taking of the Villa Real property occurred or that any such standing existed. The District Court therefore reversibly erred in entering judgment awarding damages on the basis of any such implied finding.

8. The evidence is legally or factually insufficient to support Findings Nos. 36.D., F, or any implied Finding that the City's non-renewal decision resulted in a compensable "taking" or other loss to or of the Villa Real property or rentals, or that the owner of the Villa Real property had any standing to complain of the City's decision to not renew a [conditional use permit] for the unrelated NEI Corporation's Nolana Leasehold Property, because there is no or insufficient evidence to show that:

    a. The City regulated the Villa Real property or its rentals;

    b. The City's non-renewal decision diminished or destroyed the value of any beneficial use of the Villa Real property or its rentals; or

    c. The Villa Real property's owner had standing to complain of the City's decision to not renew a [conditional use permit] for the unrelated NEI Corporation's Nolana leasehold property.

Therefore, the District Court reversibly erred in entering judgment awarding $1.5 million dollars in property loss and $2.4 million dollars in rental losses for the Villa Property and rentals upon the basis of any such finding and/or implied finding.

9. The evidence is legally or factually insufficient to support Findings Nos. 36.A and B. or any implied Finding that the City's non-renewal decision resulted in a compensable "taking" or other loss of investments in Collage or in a "taking" of Collage profits which were to have been paid out of its sales proceeds, and the District Court reversibly erred in entering judgment awarding $250,000 in allegedly-lost investments and $350,000 in alleged lost-profits proceeds for the Collage establishment upon the basis of any such finding and/or implied finding.

10. The evidence is legally or factually insufficient to demonstrate or to support any implied finding of a regulatory taking under TEX. CONST. art. 1, § 17, or to support any implied finding that:

   a. Appellees had a cognizable investment-backed expectation that a [conditional use permit] would be renewed or that a [conditional use permit] could create such an expectation; that

   b. Promotions of [America] was capable of having an investment-backed expectation that Nolana Entertainment's [conditional use permit] would be renewed; that

   c. The pledge of the Villa Real property to secure Nolana Entertainment's note could create such an expectation; that

   d. The [conditional use permit] nonrenewal decision had a legally-cognizable economic impact on the Nolana leasehold or the Villa Real property; or that

   e. The [conditional use permit] nonrenewal decision diminished the use-value of the Nolana leasehold or the Villa Real property.

Accordingly, the District Court reversibly erred in entering judgment awarding damages based upon any such implied findings.

11. The conclusive or great weight and preponderance of the evidence demonstrates that the City's nonrenewal decision prevented what would or legally could have been a nuisance, and that the City thus merely acted to protect the public under its inherent police powers. The District Court therefore erred in impliedly finding to the contrary, and reversibly erred in entering judgment awarding damages on the basis of any such implied finding.

12. As a matter of law, "substantially advances" cannot be used as a basis for determining whether an art. I, § 17 taking occurred. The District Court's numerous findings and conclusions ostensibly demonstrating that the non-renewal decision was "arbitrary and capricious" or other otherwise invalid therefore do not support the "taking" judgment, and the District Court reversibly erred in entering judgment awarding damages upon such findings and conclusions.

13. The evidence is legally or factually insufficient to demonstrate or support an implied finding that the City's non-renewal decision did not substantially advance a legitimate governmental interest or bear a substantial relationship to the public health, safety, morals, or general

30

welfare of the City's residents, and the District Court reversibly erred in entering judgment awarding damages on the basis of any such implied finding.

14. The evidence is legally or factually insufficient to demonstrate or to support Findings Nos. 35 and 36 or the Court's "conclusion" that the City acted arbitrarily and capriciously in failing to renew the [conditional use permit] and that appellees suffered damages from such conduct, and the District Court reversibly erred in entering judgment awarding damages upon the basis of such findings "conclusion."

15. The evidence is legally or factually sufficient to support:

a. the District Court's Findings Nos. 3, 4, 5, 6, 7, 8, 9, 10, 13, 14, 15 16, 18, 20, 21, 22, 23, 25, 26, 27, 28, 29, 32, 33, and 34,

b. the District Court's "conclusion" that NEI d/b/a Collage complied iwth all ordinances and City staff requests relevant to its [conditional use permit] request, or

c. the District Court's "conclusion" that the City failed to follow its own ordinances in denying the [conditional use permit].

Accordingly, the District Court reversibly erred in entering judgment awarding damages on the basis of such findings and/or "conclusions."

16. The District Court erred in concluding that the City's failure to renew the [conditional use permit] constituted arbitration and capricious conduct amounting to a taking under the Texas Constitution which deprived the Appellees of property without due course of law, and reversibly erred in entering judgment awarding damages upon the basis of such conclusions.

The appellees' takings claim is premised on the Texas Constitution. Article I, section 17 of the Texas Constitution provides that "[n]o person's property shall be taken, damaged or destroyed or applied to public use without adequate compensation being made . . . ." TEX. CONST., art. I, § 17. Absent a cognizable property interest, a claimant is not entitled to compensation under article I, section 17. *Hallco Tex., Inc. v. McMullen County*, 221 S.W.3d 50 (Tex. 2006); *Tarrant County v. Ashmore*, 635 S.W.2d 417, 422 (Tex. 1982). The question of whether a taking has occurred is a matter of law on which

31

an appellate court owes no deference to a trial court's determination. *Mayhew*, 964 S.W.3d at 937; *see Sheffield Dev. Co. v. City of Glenn Heights*, 140 S.W.3d 660, 673 (Tex. 2004); *Rowlett/2000, Ltd. v. City of Rowlett*, 231 S.W.3d 587, 590 (Tex. App.—Dallas 2007, no pet.). We depend on the trial court, however, to resolve disputed fact issues and rely on the trial court's findings on disputed facts to determine these legal questions. *See Sheffield Dev. Co.*, 140 S.W.3d at 673; *2218 Bryan St., Ltd. v. City of Dallas*, 175 S.W.3d 58, 65 (Tex. App.—Dallas 2005, pet. denied). The burden of proving that a taking occurred is on the property owners. *City of Houston v. Trail Enters., Inc.*, 300 S.W.3d 736, 738–39 (Tex. 2009).

A plaintiff may invoke multiple distinct theories in challenging a government regulation as an unconstitutional taking. *City of Houston v. Maguire Oil Co.*, 342 S.W.3d 726, 735 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (citing *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 548 (2005)); *Sheffield Dev. Co.*, 140 S.W.3d at 671–72). The plaintiff may assert: (1) a physical taking, which occurs when regulatory action requires an owner to suffer physical invasion of his property; (2) a total regulatory taking which occurs when regulatory action completely deprives an owner of all economically beneficial use of his property, as discussed in *Lucas v. S. Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992); (3) a *Penn Central* taking, which occurs when regulatory action unreasonably interferes with a property owner's right to use and enjoy his property, as discussed in *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978); or (4) a land-use exaction, which occurs when the government requires an owner to give up his right to just compensation for property taken in exchange for a discretionary benefit conferred by the government, as discussed in

32

*Dolan v. City of Tigard*, 512 U.S. 374, 384 (1994). *See City of Houston*, 342 S.W.3d at 735–36.[5]

Because we can affirm the trial court's decision based on a *Penn Central* taking, we need not address the other theories herein. *See* TEX. R. APP. P. 47.1, 47.4. Under *Penn Central, a* regulatory taking occurs when the government has unreasonably interfered with a property owner's right to use and enjoy his property considering the following three factors: (1) "the economic impact of the regulation on the claimant;" (2) "the extent to which the regulation has interfered with distinct investment-backed expectations;" and (3) "the character of the governmental action." *See Penn Cent. Transp. Co.*, 438 U.S. at 124; *Sheffield Dev. Co.*, 140 S.W.3d at 672. Generally, no one single factor should be considered paramount. *Sheffield*, 140 S.W.3d at 672. In addition to these factors, which are generally referred to as the *Penn Central* factors, we should consider all relevant attendant circumstances as well. *Penn Cent. Transp. Co.*, 438 U.S. at 124; *Hallco Tex., Inc*, 221 S.W.3d at 56. Such a determination depends heavily on the individual context and surrounding circumstances. *Sheffield,* 140 S.W.3d at 672; *see City of Houston*, 342 S.W.3d at 736–37. Stated otherwise, we consider all of the surrounding circumstances in applying "a fact-sensitive test of reasonableness" but "whether the facts are sufficient to constitute a taking is a question of law." *Edwards Aquifer Auth. v. Day*, 369 S.W.3d 814, 839 (Tex. 2012) (internal citations omitted); *see Sheffield Dev. Co.*, 140 S.W.3d at 673 (stating that we may generally depend on the

---

[5] Appellees do not assert a separate claim under the Takings Clause of the Fifth Amendment to the United States Constitution, but instead invoke only Article I, Section 17 of the Texas Constitution in their pleadings. Although our takings provision is worded differently than the Takings Clause of the Fifth Amendment to the United States Constitution, the Texas Supreme Court has described it as "comparable." *Sheffield Devel. Co. v. City of Glenn Heights*, 140 S.W.3d 660, 669 (Tex. 2004); *see Hallco Tex., Inc. v. McMullen County*, 221 S.W.3d 50, 56 (Tex. 2006). Thus, in applying the relevant Texas constitutional provision to the circumstances of this case, we look to federal takings jurisprudence for guidance. *See Sheffield*, 140 S.W.3d at 669.

trial court to resolve disputed fact issues even in assessing the *Penn Central* factors). Ultimately, the inquiry involves a determination of whether "justice and fairness" require economic injuries caused by government action to be compensated by the government actor. *See Penn Cent. Transp. Co.*, 438 U.S. at 123–24; *Sheffield Dev. Co.*, 140 S.W.3d at 670–71.

## A. ECONOMIC IMPACT

We will begin by considering the first *Penn Central* factor, the economic impact of the City's denial of the conditional use permit. *See Sheffield Dev. Co.*, 140 S.W.3d at 677. While the government does not guarantee the profitability of each parcel of land subject to its authority, the value of the property and the severity of the economic impact on the property owner are both relevant factors to consider. *Id.* In assessing the value of the property and the severity of the economic impact on the property owner, we can also, under some circumstances, consider evidence of both lost investment and lost development profits. *Id.* ("[P]rofits are clearly one relevant factor to consider in assessing the value of property and the severity of the economic impact of rezoning on a landowner."); *Park v. City of San Antonio*, 230 S.W.3d 860, 869 (Tex. App.—El Paso 2007, pet. denied).[6]

The record evidence regarding the economic impact caused by the City's denial of the conditional use permit is extensive. Romero invested $250,000 in the business for the purpose of complying with City ordinances and staff requests. Romero was

---

[6] We note that before its decision in *Sheffield,* the Texas Supreme Court had previously held that, with regard to the economic impact analysis, the "loss of anticipated gains or potential future profits is not usually considered in analyzing this factor." *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 935–36 (Tex. 1998) (citing *Andrus v. Allard*, 444 U.S. 51, 66 (1979); *Moore v. City of Costa Mesa*, 886 F.2d 260, 263 (9th Cir. 1989)); *see also Weatherford v. City of San Marcos*, 157 S.W.3d 473, 490–91 (Tex. App.—Austin 2004, pet. denied).

unable to pay Ramirez $350,000.00 that was to be paid from the profits of the company. Ramirez borrowed $1,000,000.00 from Texas State Bank for the purpose of investment in the business after being assured by the Mayor of McAllen that the conditional use permit would be granted. As a result of Collage's closure, Ramirez defaulted on the $1,000,000.00 loan and Texas State Bank closed down La Villa Real, which had a value of 1.5 million dollars. At this time, Ramirez had a contract to lease La Villa Real for $17,000.00 a month for ten years, thereby costing him 2.4 million dollars.

With regard to economic impact, the City contends that appellees could have, but did not, operate Collage as a restaurant. However, Romero testified that the business ceased operating when the City denied the conditional use permit for Collage. According to Romero, the City ordered them to stop doing business, their attorneys told them that they could not keep the business open without the permit, and their landlord told them they could not open Collage. Moreover, Ramirez testified that they could not realistically operate Collage as a restaurant because it would not make money. The venue was recognized as a club, and when Hot Spots was in operation, it profited in liquor sales and lost profits in food sales because liquor sales offered a higher profit margin than food sales. He further testified that when the City denied the conditional use permit, he and Romero discussed trying to retool the business so as to operate without a conditional use permit, but the market was not there for it.

We conclude that the record contains sufficient evidence that the economic impact resulting from the City's denial of the conditional use permit for Collage was severe and that appellees were impacted adversely. The economic impact factor

35

weighs in favor of appellees. *See Sheffield Dev. Co.*, 140 S.W.3d at 672; *Park,* 230 S.W.3d at 869.

## B. INVESTMENT-BACKED EXPECTATIONS

Next, we consider whether appellees had a reasonable, investment-backed expectation in the property.[7] *See Sheffield Dev. Co.*, 140 S.W.3d at 677. The existing and permitted uses of the property constitute the "primary expectation" of the landowner that is affected by regulation. *Mayhew*, 964 S.W.2d at 936; *see Penn Cent. Transp. Co.*, 438 U.S. at 136. Historical uses of the property are critically important when determining the reasonable investment-backed expectation of the landowner. *Mayhew*, 964 S.W.2d at 937. We also consider the property owner's knowledge of existing zoning in determining whether the regulation interferes with investment-backed expectations. *Id.* at 936. The zoning regulations in place at the time that the property owner bought the property are also to be considered. *Id.* When considering this factor, we must determine if the property owner's expectations in question were reasonable. *Canal Ins. Co. v. Hopkins*, 238 S.W.3d 549, 569–70 (Tex. App.—Tyler 2007, pet. denied) (citing *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984)). In this regard, a reasonable investment-backed expectation must be more than a "unilateral expectation or an abstract need." *Id.* (quoting *Ruckelshaus*, 467 U.S. at 1005). Further, we must evaluate the reasonableness of the property owner's expectations in the context of the industry in which it operates. *See id.*

---

[7] We note that it is well settled in Texas that "property owners do not acquire a constitutionally protected vested right . . . in zoning classifications once made." *City of Univ. Park v. Benners*, 485 S.W.2d 773, 778 (Tex. 1972). The City retains its legislative authority to re-zone at any time as public necessity demands. *City of Pharr v. Tippitt*, 616 S.W.2d 173, 176 (Tex. 1981). In this case, however, appellees are not arguing that they possessed a vested interest in obtaining the conditional use permit, but that the City's denial of the permit interfered with their right to use and enjoy the property.

Appellees argue that, under the analysis in the San Antonio Court of Appeals' opinion in *City of San Antonio v. El Dorado*, 195 S.W.3d 238 (Tex. App.—San Antonio 2006, pet. denied), they have suffered a regulatory taking, because, like the property owner in *El Dorado*, the City's regulatory action unreasonably interfered with their right to use and enjoy the property. In *El Dorado,* the claimant had owned and operated a bar, pool hall, and club which sold alcoholic beverages. *Id.* at 243. The zoning commission recommended that the area be rezoned as an area which did not allow the sale of alcoholic beverages. *Id.* The San Antonio City Council approved that request and rezoned the area. *Id.* The claimant applied for a non-conforming use to operate a bar with on-premises alcohol consumption; however, the City of San Antonio denied the request. *Id.* After its appeals were denied, the claimant brought a regulatory takings claim. *Id.*

Our sister court of appeals concluded that the claimant suffered a compensable regulatory taking when San Antonio changed the existing zoning classification, so that the property could no longer be used as a bar and lounge. *Id*. at 247. The court focused much of its factual takings analysis on the property's historical use as a bar. *Id*. at 246–47. According to the opinion, the property had been used as a bar continuously for eighteen years at the time the city re-zoned. *Id*.

In the instant case, the leasehold at issue had utilized live music for years, as had another facility in the same shopping center, which as the existing and permitted use of the property reflects the "primary expectation" of the landowner that is affected by regulation. *Mayhew*, 964 S.W.2d at 936; *see Penn Central*, 438 U.S. at 136. Collage had been in operation under a conditional use permit for the period of one year at the

time that the City denied the conditional use permit. In examining whether appellees' expectations were reasonable in the context of the industry in which Collage operated, we note that the evidence reflects that other bars with greater or similar levels of complaints, including one in the same shopping center, had obtained conditional use permits. The evidence also reflects that none of the investigations regarding Collage, including the TABC investigation, multiple police visits, the City's investigations, and private investigations, evidenced any verifiable problems with Collage. The evidence further reflects that the individuals who complained about the noise allegedly emanating from Collage lived further from Collage than individuals who had no complaints about noise. Further, appellees received personal assurances from the former mayor that obtaining the conditional use permit would be no problem.[8] The record evidence also indicates that appellees extensively, repeatedly, and expensively renovated Collage, in conjunction with visits by City employees, to reduce the alleged noise problems. In terms of appellees' expectations regarding the financial success of Collage, the evidence indicates that appellees had historically operated multiple successful and remunerative nightclubs.

Appellees contend that their compliance with the noise restrictions, their continuous and expensive renovations, and the City's numerous inspections of the facility, all indicate they had a reasonable, investment-backed expectation to operate Collage with a conditional use permit. In evaluating this factor, we consider the analysis in *Sheffield* to be instructive:

> Sheffield's expectations were certainly reasonable. The PD 10 zoning had been in place for ten years before Sheffield acquired the property, and

---

[8] The comments by the mayor are not binding on the City; however, we consider them in the context of evaluating the reasonableness of appellees' investment-backed expectations.

part of the subdivision had already been developed under that zoning scheme consistent with the City's comprehensive land use plan. Moreover, Sheffield's expectations were not merely those of any landowner, or even those of any developer; rather, Sheffield's expectations were based in large part, and legitimately so, on its efforts to deal with the City. Sheffield met with city officials to present his plans for development and inquire about any contemplated zoning changes, and as the trial court found, its reliance on representations made in those meetings was in good faith. Although no City employee ever promised Sheffield that there would be no change in zoning (nor would any such promise have bound the City), it is fair to say that the moratorium and rezoning blindsided Sheffield, just as the City intended. Evidence of Sheffield's dealings with the City is not, as the City argues, an improper basis to estop the City, but proof of the reasonableness of Sheffield's expectations.

*Sheffield Dev. Co.*, 140 S.W.3d at 677–78. Based on the foregoing, we conclude that the appellees possessed a reasonable investment-backed expectation in Collage. *See id.* This factor weighs in favor of appellees.

### C. CHARACTER OF THE GOVERNMENTAL ACTION

The factor regarding the character of the governmental action is the least concrete, and also appears to carry the least weight. *See Lingle*, 544 U.S. at 539 ("[T]he *Penn Central* inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests."). This factor's purpose is to elicit consideration of whether a regulation disproportionately harms a particular property. *See Sheffield Dev. Co.*, 140 S.W.3d at 678 (factor includes consideration of whether "the rezoning . . . was general in character and not exclusively directed at" claimant). A taking may more readily be found when the interference with property can be characterized as a physical invasion by government than as a public program adjusting the benefits and burdens of

39

economic life to promote the common good." *Penn Cent. Transp.*, 438 U.S. at 124; *Canal Ins. Co.*, 238 S.W.3d at 571–72.

The zoning ordinance at issue herein, section 138–111 of the McAllen zoning ordinances, describes the purpose of a conditional use permit:

> To allow the compatible and orderly development, within the city, of uses which may be suitable only in certain locations in a zoning district if developed in a specific way or only for a limited period of time.

This section may be characterized more as a "public program adjusting the benefits and burdens of economic life to promote the common good" than as a "physical invasion by government." *See Penn Cent. Transp.*, 438 U.S. at 124, *Canal Inso. Co.*, 238 S.W.3d at 571–72. Our analysis of this factor weighs against appellees.

### D. Conclusion

Considering the economic impact of the City's denial of the conditional use permit, the extent to which that denial interfered with appellees' investment-backed expectations; the character of the governmental action, and all relevant attendant circumstances, and based on the trial court's resolution of disputed facts, we conclude that the facts herein are sufficient to constitute a taking under the relevant legal standard. *See Penn Cent. Transp. Co.*, 438 U.S. at 124; *Sheffield Dev. Co.*, 140 S.W.3d at 672. Accordingly, we overrule issues four through sixteen.

### V. Damages

The City's seventeenth issue attacks the damage awards. The seventeenth issue states:

> The District Court erred in awarding damages for the alleged losses found in Findings Nos. 36.A.-F. and in awarding prejudgment interest because:

40

a.  As a matter of law, the alleged losses described in Findings Nos. 36.A.-E. constitute incorrect measures of damages for which TEX. CONST. art. 1, § 17 does not provide recovery;

b.  There is factually or legally insufficient evidence to support Findings Nos. 36.A. and B. that the [conditional use permit] non-renewal decision was the cause of constitutionally-compensable "taking" losses in the form of sound insulation expenses allegedly paid by Romero and Collage profits which were allegedly to have been paid to Ramirez out of the sales proceeds of the Collage establishment situated on the Nolana leasehold;

c.  There is legally or factually insufficient evidence to support Findings Nos. 36.C.-F. that the [conditional use permit] non-renewal decision was the cause of constitutionally-compensable "taking" losses of the Villa Real property and prospective rental income, alternatively, the award of $1.5 million to Ramirez for loss of the Villa Real property and award of $2.4 million to Ramirez for the alleged loss of ten years of rental income for the Villa Real constituted a double recovery; and

d.  In the further alternative, no legal authority exists for an award of prejudgment interest on the $2.4 million which was awarded to Ramirez for future lost rentals on the Villa Real property.

Accordingly, the District Court reversibly erred in awarding "taking" damages upon the basis of any and all such findings, and in awarding prejudgment interest.

In the instant case, the trial court awarded Romero $250,000.00 as money invested in Collage for the business for the purpose of complying with City ordinances and staff requests.  The trial court awarded Ramirez $350,000.00 as money owed to Ramirez by Romero that was to have been paid from the profits of Collage and as money that purchasers of Collage would have paid to Ramirez upon the sale of Collage.  The trial court awarded Ramirez $1.5 million for the loss of La Villa Real, which was used to collateralize the loans underlying Collage, and further awarded him $2.4 million for the loss of the lease of La Villa Real.

41

The City contends, in short, that the "only correct measure" of the damages is the loss or impairment to the regulated property's value resulting from the regulatory conduct. In support of its contention, the City cites *Mayhew*, 964 S.W.2d at 935–36, *City of San Antonio*, 195 S.W.3d at 247–248, and *Dahl v. State*, 92 S.W.3d 856, 863 (Tex. App.—Houston [14th Dist.] 2002, no pet.). The excerpt from *Mayhew* cited by the City concerns not the proper measure of damages in a regulatory taking case, but instead concerns the parameters for consideration of the economic impact factor under *Penn Central*. The *Dahl* case is similarly inapposite insofar as it concerns the governmental condemnation of an entire piece of real property with the measure of damages as instructed by the Texas Property Code. *Dahl*, 92 S.W.3d at 863 (discussing property code section 21.042(b)). *City of San Antonio* stands for the proposition that the ability of a business to make a profit is reflected in its market value, and so when awarding market value, one should not also award lost profits because it will constitute a double recovery. *See City of San Antonio*, 195 S.W.3d at 247. None of these cases address the appropriate measure of damages for a regulatory taking under *Penn Central* regarding a business run from a leasehold.

Whether damages for a taking are compensable under the constitution depends on the type of damage involved, and compensability is a question of law for the court, subject to de novo review. *County of Bexar v. Santikos*, 144 S.W.3d 455, 459 (Tex. 2004); *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001); *State v. McCarley*, 247 S.W.3d 323, 334 (Tex. App.—Austin 2007, pet. denied).

The Texas Constitution provides that no person's property "shall be taken, damaged or destroyed for or applied to public use without adequate compensation

42

being made." TEX. CONST. art. I, § 17. Translating this concept into a workable scheme that produces a "just, fair, and full compensation has often engrossed the best thought of the courts*." Hart Bros. v. Dallas Cnty.*, 279 S.W. 1111, 1111 (Tex. 1926). The owner's loss is measured by the extent to which governmental action has deprived him of an interest in property. *See United States v. Gen. Motors Corp.*, 323 U.S. 373, 378 (1945). The value of that interest, in turn, is determined by isolating it as a component of the overall fair market value of the affected property. *See Kimball Laundry Co. v. United States*, 338 U.S. 1, 7 (1949). It is the duty of the court to determine compensation which places the owner of property "in as good a position pecuniarily as if his property had not been taken." *Yancey v. United States*, 915 F.2d 1534, 1543 (quoting *Olson v. United States*, 292 U.S. 246, 255, 78 L. Ed. 1236, 54 S. Ct. 704 (1934)). There is not a rigid rule for determining what just compensation is under all circumstances and in all cases. *United States v. Commodities Trading Corp.*, 339 U.S. 121, 123 (1950).

Nevertheless, not all losses that plaintiff suffers as a result of a taking are compensable. *United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 281 (1943). Compensation is limited to what was actually taken by the government and excludes indirect or remote injuries. *See Gen. Motors Corp.*, 323 U.S. at 379. "It is a well settled principle of Fifth Amendment taking law . . . that the measure of just compensation is the fair value of what was taken, and not the consequential damages the owner suffers as a result of the taking." *Yuba Natural Resources, Inc. v. United States*, 904 F.2d 1577, 1581 (Fed. Cir. 1990) (citing *Kimball Laundry Co.*, 338 U.S. at 7); *see also Gen. Motors Corp.*, 323 U.S. at 379; *Yancey*, 915 F.2d at 1542. Examples

43

of costs that are not recoverable because they are consequential are destruction of the business, frustration of contract or business, the cost of compliance with the regulations, the losses sustained by the owner because of the difficulty of finding other premises, moving costs, and expenses incurred in having to readjust manufacturing operations. *See, e.g., Mitchell v. United States*, 267 U.S. 341, 345 (1925); *Atlas Corp. v. United States*, 15 Cl. Ct. 681, 688 (1988), *aff'd*, 895 F.2d. 745, 755–56 (Fed. Cir. 1990); *Klein v. United States*, 375 F.2d 825, 829 (Ct. Cl. 1967). A condemnee "may recover damages which are reasonably foreseeable." *City of Pearland v. Alexander*, 483 S.W.2d 244, 247 (Tex. 1972).

When a governmental entity condemns real property, the normal measure of damages is the fair market value of the land at the time of the taking. TEX. PROP. CODE ANN. § 21.042(b) (West Supp. 2011); *see Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 627 (Tex. 2002). Thus, the central issue in the typical condemnation case is how to measure the market value of the condemned property. *See City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001). Market value is "the price the property will bring when offered for sale by one who desires to sell, but is not obligated to sell, and is bought by one who desires to buy, but is under no necessity of buying." *Id*. The three traditional approaches to determining market value are the comparable sales method, the cost method, and the income method. *Id.* Regardless of the appraisal method used by an expert, the goal of the inquiry is always to find the fair market value of the condemned property. *Id*. at 183.

The trial court in the instant case did not award damages based on market value or profit. Instead, it awarded damages directly invested in Collage to reduce noise and

damages attributable to the closure of Collage. We conclude that the properly awarded consequential damages approximately caused by the City's actions include (1) the award of $250,000.00 as money invested in Collage for the business for the purpose of complying with City ordinances and staff requests, and (2) the award of $350,000.00 as money owed to Ramirez by Romero that was to have been paid from the profits of Collage and as money that purchasers of Collage would have paid to Ramirez upon the sale of Collage.

We next address the trial court's awards of $1.5 million for the loss of La Villa Real and $2.4 million for the loss of the lease of La Villa Real. In the instant case, Ramirez testified that he lost La Villa Real by defaulting on the note to Texas State Bank as a direct result of the City's actions in this case. La Villa Real had a fair market value of $1.5 million at that time based on an appraisal performed by Texas State Bank. We conclude that this loss was reasonably foreseeable and supported the trial court's award of damages. *See Gen. Motors Corp.*, 323 U.S. at 379. The trial court's award of $2.4 million for the loss of the lease of La Villa Real is similarly supported by the record. Ramirez testified that Graham Central Station had submitted a letter of intent to rent La Villa Real for a period of ten years for approximately $17,000.00 monthly, and the record includes that letter of intent. *See City of Austin v. Teague*, 570 S.W.2d 389, 394 (Tex. 1978) (recognizing loss of rentals as appropriate measure of temporary damages where "plaintiffs lost all use of their land" and city had in effect acquired a scenic easement on plaintiffs' land at no cost). We note, in this regard, that the City contends that the award of La Villa Real's value and the loss of the rentals constitute duplicative awards; however, the City's briefing fails to support this proposition. The City avers that

45

the "future profits from renting the Villa Real were subsumed in the $1.5 million market value award;" however, there is no expert testimony or evidence to support this conclusion.

Finally, the City argues on appeal that the judgment improperly awarded prejudgment interest on future damages insofar as the judgment includes prejudgment interest on "$2.4 million for lost future rental of the Villa Real property and $350,000 lost profit from the future sale of Collage."

Section 304.102 of the finance code authorizes an award of pre-judgment interest "in a wrongful death, personal injury, or property damage case." TEX. FIN. CODE ANN. § 304.102 (West 2006). Pre-judgment interest is measured from the "earlier of the 180th day after the date the defendant receives written notice of a claim or the date the suit is filed and ending on the day preceding the date judgment is rendered." *Id.* § 304.104. However, "[p]re-judgment interest may not be assessed or recovered on an award of future damages." *Id.* § 304.1045 (West 2006). Instead, it is intended to compensate "for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment." *Brainard v. Trinity Universal Ins. Co.*, 216 S.W.3d 809, 812 (Tex. 2006).

We review a trial court's award of pre-judgment interest under an abuse of discretion standard. *See Morales v. Morales*, 98 S.W.3d 343, 348 (Tex. App.—Corpus Christi 2003, pet. denied). A trial court abuses its discretion by ruling (1) arbitrarily, unreasonably, or without regard to guiding legal principles; or (2) without supporting evidence. *See Ford Motor Co. v. Garcia*, 363 S.W.3d 573 (Tex. 2012); *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998).

46

It is undisputed in this case that appellees' claims accrued when the City denied the conditional use permit. Their right to redress accrued at that time, not upon the happening of future events that were foreclosed by the City's actions—that is, the rental of La Villa Real and the sale of Collage. Therefore, we hold these are not future damages and that the trial court did not abuse its discretion in awarding prejudgment interest on these elements of damages. *See* TEX. FIN. CODE ANN. § 304.1045; *see also Tex. Specialty Trailers, Inc. v. Jackson & Simmen Drilling Co.*, No. 2-07-228-CV, 2009 Tex. App. LEXIS 6318, at **30–31 (Tex. App.—Fort Worth Aug. 13, 2009, pet. denied) (mem. op.) (determining that damages for the costs of repair or replacement of a rig did not constitute "future damages" under the finance code).

## VI. ADDITIONAL FINDINGS AND CONCLUSIONS

By its eighteenth issue, the City contends that the trial court erred in failing to make the City's additional requested findings of fact and conclusions of law. Rule 298 of the Texas Rules of Civil Procedure permits a party to request specific additional or amended findings or conclusions "after the court files original findings of fact and conclusions of law." TEX. R. CIV. P. 298. The rule requires additional findings of fact and conclusions of law only if they relate to "ultimate or controlling issues." *Rich v. Olah*, 274 S.W.3d 878, 886 (Tex. App.—Dallas 2008, no pet.); *Assoc. Tel. Directory Publishers v. Five D's Publishing Co.*, 849 S.W.2d 894, 901 (Tex. App.—Austin 1993, no writ). An ultimate fact issue is one essential to the cause of action that would have a direct effect on the judgment. *Rich,* 274 S.W.3d at 886; *see Gen. Elec. Capital Corp. v. ICO, Inc.*, 230 S.W.3d 702, 711 (Tex. App.—Houston [14th Dist.] 2007, pet. denied)

47

("The controlling issue is whether the circumstance of the particular case would require an appellant to guess the reasons for the trial court's judgment.").

A court is not required to make additional findings of fact that are unsupported in the record, that are evidentiary, or that are contrary to other previous findings. *Rich*, 274 S.W.3d at 886; *Buckeye Retirement Co., LLC, Ltd. v. Bank of Am., N.A.*, 239 S.W.3d 394, 402 (Tex. App.—Dallas 2007, no pet.); *see also Collins v. Walker*, 341 S.W.3d 570, 574–75 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (op. on reh'g) ("A trial court has no duty to make additional or amended findings that are unnecessary or contrary to its judgment; a trial court is only required to make additional findings and conclusions that are appropriate. . . . [T]he trial court is not required to make additional findings which conflict with the original findings."); *Rafferty v. Finstad*, 903 S.W.2d 374, 376 (Tex. App.—Houston [1st Dist.] 1995, writ denied) (only necessary finding was ultimate issue—whether division of marital estate was just and right—rather than evidentiary findings as to parties' relative earning capacities, investments of separate property in community residence, or cruelty). Further, the trial court is not required to make additional findings and conclusions that are aimed at tying down the court's reasoning rather than its conclusions. *In re S.E.K.*, 294 S.W.3d 926, 930 (Tex. App.—Dallas 2009, pet. denied); *Stuckey Diamonds, Inc. v. Harris Cnty. Appraisal Dist.*, 93 S.W.3d 212, 213 (Tex. App.—Houston [14th Dist.] 2002, no pet.); *Vickery v. Comm'n for Lawyer Discipline*, 5 S.W.3d 241, 254 (Tex. App.—Houston [14th Dist.] 1999, pet. denied). The burden is on the party requesting additional findings of fact and conclusions of law to show how the trial court's failure to make additional findings and conclusions prevents that party from adequately presenting its complaint on appeal.

*See Johnston v. McKinney Am., Inc.*, 9 S.W.3d 271, 277 (Tex. App.—Houston [14th Dist.] 1999, pet. denied).

The City requested fifteen additional findings that, inter alia: Romero personally owned Collage; Ramirez personally owned Collage; Ramirez owned Villa Real; neither Nolana nor Promotions had standing or capacity to bring the takings claim; Collage was a property interest subject to a takings claim; the residents' testimony did not support denial of the conditional use permit and was not entitled to credibility or weight; the denial of the conditional use permit meant that the conditional use permit holder was unable to operate any other business activity for which a conditional use permit was not required; Montalvo's representation that the conditional use permit would be no problem was either binding on the City, estopped the City from denying the conditional use permit, or represented the official action of the City "even though made by the Mayor outside of a duly constituted and posted meeting"; the measure of losses to Romero constitutes the amount he invested in Collage and that amount, rather than lost profits, represents the measure of losses in a takings claim; as Romero's creditor, Ramiro is entitled to hold the City responsible for Romero's failure to meet his obligations to Ramirez; Ramirez is entitled to hold the City responsible for the value of La Villa Real, which was used to collateralize a loan from Texas State Bank to Nolana; Ramirez is entitled to hold the City responsible for lost lease revenues that would have been generated from La Villa Real; Ramirez is entitled to hold the City responsible for his inability to meet his debt obligations to Texas State Bank; and the City is not entitled to immunity because immunity does not apply to takings claims under the Texas Constitution, or the monetary award to Romero and Ramirez is the value of the loss of

49

the business activity resulting from the conditional use permit regulation and does not constitute a damage claim that would otherwise be barred by immunity.

The City contends that it has been forced to "guess" about the reasons for the trial court's judgment. *See Limbaugh v. Limbaugh*, 71 S.W.3d 1, 7 (Tex. App.—Waco 2002, no pet.) ("In factually complicated situations in which there are two or more possible grounds for recovery or defense, an undue burden would be placed upon an appellant [if the trial court fails to file more detailed conclusions of law].") (internal quotation omitted). As an initial matter, the City fails to specifically identify how the trial court's failure to make additional findings and conclusions prevents it from presenting its complaints on appeal. *See Johnston*, 9 S.W.3d at 277. In this regard, we note that the City's amended brief is fifty pages long and its reply brief comprises an additional twenty-five pages. Further, we cannot agree with the City that the trial court's findings of fact and conclusions of law, which fill six pages, force the City to try to guess the reason or reasons the trial judge ruled against it. *See Limbaugh*, 71 S.W.3d at 7. And finally, we conclude these additional requested findings were not on ultimate or controlling issues, but on evidentiary matters, matters contrary to the trial court's express findings, or were aimed at tying down the trial court's reasoning. *In re S.E.K.*, 294 S.W.3d at 930; *Rich*, 274 S.W.3d at 886. We overrule the City's eighteenth issue.

## VII. CONCLUSION

We affirm the judgment of the trial court.

_____
ROGELIO VALDEZ
Chief Justice

Delivered and filed the
18th day of July, 2013.

50